

1

2

Maureen L. Fox, SBN 172711

3  Attorney for Gregory Williams, Petitioner
PMB 431, 15732 Los Gatos Blvd.

4  Los Gatos, CA 95032
Tel: (408) 358-2135

5  Fax: (408) 228-0887
Email: attorneyfox@verizon.net

6

E-filing

*FILED*

*AU ... 2007*

*RICHARD W. WIEKING*
*CLERK. U.S. DISTRICT COURT*
*NORTHERN DISTRICT OF CALIFORNIA*

7

8              UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA    **TEH**

9

Gregory Williams,                    )

10  Petitioner,                      )
)     No.  **07 4269**

11                                   )
v.                               ) MEMORANDUM OF POINTS

12                                   ) AND AUTHORITIES
Robert Horel, Warden               )

13                                   ) IN SUPPORT OF
Respondent.                        ) PETITION FOR WRIT

14  _____  ) OF HABEAS CORPUS

15

16

17

18

19

20

21

22

23

24

25

26

27

TABLE OF CONTENTS

|  |  | page |
|---|---|---|
| Table of Authorities |  | ii |
| Procedural History |  | 1 |
| Statement of Facts |  | 1 |

Argument

I. The Police Interrogations Of Petitioner Were Inadmissible Because They Violated His Fifth And Fourteenth Amendment Rights As Set Forth In *Miranda v. Arizona.*

| A. Factual Background | 2 |
|---|---|
| B. The Decision Is Contrary To Clearly Established Federal Law. | 3 |
| C. The Decision is Based on an Unreasonable Determination of the Facts. | 5 |
| D. The Admission of the Interrogations Was Prejudicial Error Warranting Relief. | 6 |

II. The Trial Court Erred And Violated Petitioner's Rights Against Self-Incrimination And To Due Process By Admitting Into Evidence The Police Interrogations Because Petitioner's Responses Were Not Voluntary.   7

| A. The Law Regarding Voluntariness of Defendants' Statements | 7 |
|---|---|
| B. The Decision is Based on an Unreasonable Determination of the Facts and Contrary To Clearly Established Federal Law. | 8 |
| C. The Admission of the Interrogations Was Prejudicial Error Warranting Relief. | 12 |

III. The Conviction For Burglary Was Unsupported By The Evidence And Violated Petitioner's Due Process Rights.   15

IV. The Trial Court Violated Petitioner's Due Process Rights By Admitting Evidence Of A Prior Sexual Offense And Unreliable Evidence Contained In The Tapes And Transcripts Of The Police Interrogations.   17

A.  The Tapes and Transcripts of the Interrogations Were So
    Unreliable and Inflammatory that their Admission Infected the
    Trial with Unfairness.                                          17

B.  The Admission of the Interrogations Was Prejudicial Error
    Warranting Relief.                                              27

V.  The Prosecutor Engaged In Misconduct That Violated Petitioner's
    Due Process Rights.                                             27

A.  Misconduct by the Prosecutor Rendered the Trial
    Fundamentally Unfair.                                           27

B.  The Prosecutor's Misconduct was Prejudicial and Warrants
    Relief.                                                         30

Conclusion                                                         31

TABLE OF AUTHORITIES

page

<u>United States Constitution</u>

Fifth Amendment     2,7,17
Fourteenth Amendment     2,7,17

<u>Statutes</u>

California Health and Safety Code section

11550     20

California Penal Code section

220     13
264.1     15
288     15
289     15
290     21
459     15
602.5     14
647.6     16,19,25
667     14
1170.12     14

<u>United States Code</u>

28 U.S.C. § 2254     3

<u>Cases</u>

*Alvarez v. Gomez,* 185 F.3d 995 (9th Cir. 1999)     6

*Ashcraft v. Tennessee,* 322 U.S. 143 (1944)     7

*Barker v. Wingo*, 407 U.S. 514 (1972)     26

*Blackburn v. Alabama,* 361 U.S. 199 (1960)     17

*Bousley v. United States,* 523 U.S. 614 (1998)     26

*Brecht v. Abrahamson*, 507 U.S. 619 (1993)     14,31

*Clark v. Murphy*, 331 F.3d 1062 (9th Cir. 2003)     5

*Colorado v. Connelly,* 479 U.S. 157 (1986)     4,7

*Darden v. Wainwright*, 477 U.S. 168 (1986)     30,31

| | |
|---|---|
| *Davis v. United States,* 512 U.S. 45 (1994) | 3,4 |
| *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974) | 30 |
| *Duncan v. Louisiana,* 391 U.S. 145 (1968) | 26 |
| *Fikes v. Alabama,* 352 U.S. 191 (1957) | 7 |
| *Giglio v. United States*, 405 U.S. 150 (1972) | 31 |
| *Greenwald v. Wisconsin,* 390 U.S. 519 (1968) | 7 |
| *In re Winship,* 397 U.S. 358 (1970) | 26 |
| *Jackson v. Denno,* 378 U.S. 368 (1964) | 7 |
| *Jackson v. Virginia,* 443 U.S. 307 (1979) | 15,17 |
| *Lego v. Twomey,* 404 U.S. 477 (1972) | 7 |
| *Leyra v. Denno,* 347 U.S. 556 (1954) | 7 |
| *Lincoln v. Sunn,* 807 F.2d 805 (9th Cir.1987) | 31 |
| *Lisenba  v. California,* 314 U.S. 219 (1941) | 17,26 |
| *Manson v. Brathwaite,* 432 U.S. 98 (1977) | 17 |
| *McNeil v. Wisconsin,* 501 U.S. 171 (1991) | 5 |
| *Mincey v. Arizona*, 437 U.S. 385 (1978) | 7 |
| *Miranda v. Arizona*, 384 U.S. 436 (1966) | 2,3,4,5 |
| *North Carolina v. Butler*, 441 U.S. 369 (1979) | 4 |
| *People v. Ewoldt,* 7 Cal.4th 380 (1994) | 26 |
| *People v. Gonzalez,* 34 Cal.4th 1111 (2005) | 3 |
| *People v. Guerrero,* 16 Cal.3d 719 (1976) | 13,16,18 |
| *People v. Holloway,* 33 Cal.4th 96 (2004) | 13,16 |
| *People v. Maury,* 30 Cal.4th 342 (2003) | 7 |
| *People v. Mendoza,* 118 Cal.App.4th 571 (2004) | 13,16 |
| *People v. Montoya,* 7 Cal.4th 1027 (1994) | 15 |
| *People v. Thompson,* 50 Cal.3d 134 (1990) | 8 |
| *Pulley v. Harris*  465 U.S. 37 (1984) | 17 |
| *Reck v. Pate,*  367 U.S. 433 (1961) | 7 |
| *Schneckloth v. Bustamonte,* 412 U.S. 218 (1973) | 7 |
| *United States v. Kerr,* 876 F.2d 1440 (1989) | 18 |
| *United States v. Schule*r, 813 F.2d 978 (9th Cir.1987) | 30 |
| *United States v. Young*, 470 U.S. 1 (1985) | 30 |

In re Williams, Points and Authorities, Tables, Page iv

*Walters v. Maass,* 45 F.3d 1355 (9th Cir. 1995)          17

*Withrow v. Williams*, 507 U.S. 680 (1993)          7

## MEMORANDUM OF POINTS AND AUTHORITIES

## PROCEDURAL HISTORY

The procedural history is set forth in the fourth averment of the petition.

## STATEMENT OF FACTS

Early in the morning of October 24, 2002, Terry and Robert Bauer heard footsteps on the roof of their house, which was under construction. They heard a radio that had been left on the roof by construction workers, then what sounded like someone running and jumping. They called the police. The police came and searched, finding no one. The police left, and one officer went across the street to talk to a neighbor. Mr. Bauer also went across the street. Petitioner, the Bauers' next-door neighbor, emerged from the crawl space into the house, where Mrs. Bauer saw him. Mrs. Bauer screamed and petitioner backed away. Mrs. Bauer enclosed herself and her two children in a bedroom and had her daughter call out the window to the officer and Mr. Bauer. Petitioner was found in the master bedroom, lying on the bed with his hands behind his head, and was arrested.

Two teams of two officers each conducted back-to-back interviews of petitioner. Officer Richard Bravo believed petitioner to be under the influence of methamphetamine, which, the officer testified, can cause delusional thinking. Bravo sought to obtain information about petitioner's specific intent in entering the Bauer home. Because petitioner had a prior conviction from ten years earlier, for child molestation, a misdemeanor, the two interviews focused on the possibility that petitioner may have intended to commit a sexual felony against either Terry Bauer or her 12-year-old daughter. Petitioner's prior conviction and a tape and transcript of the interviews were admitted at trial over petitioner's objection. The jury found petitioner guilty of burglary by entering an inhabited dwelling with intent to commit a sexual felony.

I.    THE POLICE INTERROGATIONS OF PETITIONER WERE INADMISSIBLE
BECAUSE THEY VIOLATED HIS FIFTH AND FOURTEENTH AMENDMENT
RIGHTS AS SET FORTH IN *MIRANDA V. ARIZONA*.

A. Factual Background

Handcuffed in a small room (1RT 45), petitioner was interrogated in succession by two

teams of two officers each. (2RT 253-254.) After some conversation, the police gave petitioner

the *Miranda* warnings (*Miranda v. Arizona*, 384 U.S. 436 (1966)) and then immediately asked

petitioner why he was in his neighbor's house. The question was critical because without an

intent to commit larceny or a felony, petitioner would be guilty of no more than a misdemeanor

trespass. Petitioner said, "Ah, well, I think first, um, I should have a lawyer. And ah, second,

I'm trying to figure out. Well, trying to do God's will." (1CT 112.) The police proceeded to ask

questions and make comments relating to petitioner's request for counsel. (1CT 112-115.) One

officer asked petitioner "Now you said, the first thing you said, you wanted a lawyer" and

petitioner answered "Right. Well it was because ..." (1CT 113.) He was interrupted by the

officers, who said "if you want a lawyer, we'll walk out of this room. You can't talk to me if

you want a lawyer." (1CT 113.) The officer again stated that petitioner had to choose between

having a lawyer and talking to the police. (1CT 113.) Petitioner said "I want, hell, I'll just talk

to you then," but then mentioned that the card said he could have a lawyer, and pointed out that

it's an intelligent thing to do. (1CT 114.) The officers then told him there would be no lawyer at

that time and that the officer would not personally work on getting a lawyer. (1CT 114.)

Petitioner then said "I don't even need a lawyer, though. I'll just let God handle it." (1CT 114-

115.) The police proceeded to question petitioner about his intent in entering the Bauers' house.

The tapes and transcript of those interrogations, with some redactions, were admitted at trial.

The California courts decided that petitioner validly waived his *Miranda* rights. Their decision is contrary to clearly established federal law and based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding, warranting relief from this Court. 28 U.S.C. § 2254(d)

B. The Decision Is Contrary To Clearly Established Federal Law.

In *Miranda v. Arizona*, *supra*, 384 U.S. 436, the Supreme Court held that once a person is arrested, he or she has the right to remain silent and the right to consult with an attorney. *Id.* at 467, 469. If the suspect "indicates *in any manner* and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning." *Id.* at 444-45. Italics added. In *Davis v. United States,* 512 U.S. 452, 458 (1994), the United States Supreme Court held that "*after a knowing and voluntary waiver of the* Miranda *rights,* law enforcement officers may continue questioning until and unless the suspect clearly requests an attorney." *Id.* at p. 461. Italics added.

Even though petitioner did not waive his rights, and instead indicated a desire for an attorney, the police continued questioning him. Affirming the judgment, the California Court of Appeal, following the California Supreme Court's understanding of *Davis* as set forth in *People v. Gonzalez,* 34 Cal.4th 1111 (2005), ruled that "a defendant's invocation of the right to counsel during custodial interrogation . . . must be unambiguous and unequivocal to be valid" even if he had not previously waived his *Miranda* rights. Opinion, pp. 9-10, quoting *Gonzalez, supra*, at p. 1116. The requirement of an unambiguous and unequivocal assertion of the right to counsel, even in the absence of a prior waiver, is contrary to the clearly established law of *Miranda* and its progeny.

Williams Petition for Habeas Corpus Memorandum of Points and Authorities, page 3

1

2

3    *Miranda* excludes responses to custodial interrogation unless the suspect "knowingly and

4    intelligently waived his ... right to retained or appointed counsel.' *Miranda, supra,* 384 U.S. at p.

5    475.

6        An individual need not make a pre-interrogation request for a lawyer. While such
    request affirmatively secures his right to have one, his failure to ask for a lawyer

7        does not constitute a waiver. No effective waiver of the right to counsel during
    interrogation can be recognized unless specifically made after the warnings ...

8        have been given. *Miranda v. Arizona, supra,* 384 U.S. at p. 470.

9    "The courts must presume that a defendant did not waive his rights; the prosecution's burden is

10   great; but in at least some cases waiver can be clearly inferred from the actions and words of the

11   person interrogated. *North Carolina v. Butler,* 441 U.S. 369, 373 (1979). The prosecution must

12   prove by at least a preponderance of the evidence, however, that the defendant waived his

13   *Miranda* rights. *Colorado v. Connelly,* 479 U.S. 157, 168 (1986). Requiring the defendant to

14   demonstrate that he made an unambiguous request for counsel is contrary to this clearly

15   established precedent, which presumes the absence of waiver unless the prosecution

16   demonstrates waiver.

17       *Davis* does not inject any uncertainty into this clearly established precedent. *Davis*

18   requires lack of ambiguity in a request for a lawyer only after there has been a waiver, not in the

19   absence of any waiver. *Davis, supra,* 512 U.S. at p. 461. By demanding that petitioner make an

20   unequivocal and unambiguous invocation of the right to counsel, even though he had not

21   previously waived that right, the California courts applied a principle that is contrary to clearly

22   established precedent.

23

24

25

26

27   Williams Petition for Habeas Corpus Memorandum of Points and Authorities, page 4

## C. The Decision is Based on an Unreasonable Determination of the Facts.

Even if the Supreme Court precedent *did* require the defendant to show that he made an unambiguous request for counsel even in the absence of any prior waiver, petitioner's conviction cannot stand, for the state-court conclusion that petitioner made no clear request for counsel is not a reasonable determination of the facts.

Upon being read his *Miranda* rights, petitioner said "I think first, um, I should have a lawyer." (2CT 112.) The officers understood that petitioner meant that he wanted a lawyer. "Now you said, the first thing you said, you wanted a lawyer? Is that the first thing you said?" Officer Aviles asked, and petitioner responded "Right." (CT 113.) Even assuming that the initial statement had been ambiguous (see *Clark v. Murphy*, 331 F.3d 1062 (9th Cir. 2003), no ambiguity remained when petitioner agreed that the first thing he had said was that he wanted a lawyer. All that is required is "some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney in dealing with custodial interrogation by the police." *McNeil v. Wisconsin,* 501 U.S. 171, 178 (1991). Petitioner's statements could reasonably be so construed; indeed, it would be unreasonable to construe them otherwise.

Even if petitioner's confirmation that he had said that he wanted a lawyer left sufficient ambiguity to permit further clarifying questions, the state courts' determination of the facts is unreasonable, for the officers then proceeded to discourage any assertion of the right to counsel. The officers told petitioner that if he wanted a lawyer, the officers would walk out of the room (1CT 113), implying that he would left alone there, handcuffed to the table. They also told him that he had to choose between talking with the officers and having a lawyer (1CT 113), which contradicted their earlier assurance, required by *Miranda*, that petitioner had the right to the presence of an attorney before and during questioning. 1CT 111; *Miranda v. Arizona, supra,*

384 U.S. at pp. 479-480. The officers parried petitioner's repeated references to a lawyer by telling him that he could not have a lawyer just then, without reassuring him that a lawyer would be made available soon. They said "it's up to you. And then you can talk to us right now or not. (Inaudible), because right now, obviously there's not gonna be (inaudible)," prompting petitioner to say "(Inaudible) work on getting a lawyer, right?" to which Officer Bravo responded "Not right now." (CT 114.) When petitioner suggested that he thought that it would be done later, Officer Bravo did not provide confirmation, but instead told petitioner that Bravo himself would not take the necessary steps to ensure that petitioner obtained a lawyer. (CT 114.) Although petitioner was obviously concerned about how the procedure for obtaining a lawyer could be initiated, the officers offered no explanation or assurance. Only when petitioner's rights were so "clarified" that he understood that no lawyer would be provided for him anytime soon; that Officer Bravo would make no efforts to obtain a lawyer; and that, if he persisted in demanding a lawyer, the officers would walk out of the room where he was handcuffed to a table, did petitioner abandon his efforts to obtain a lawyer. (CT 115.)

In view of petitioner's repeated efforts to obtain a lawyer (comparable to those of the petitioner in *Alvarez v. Gomez,* 185 F.3d 995 (9th Cir. 1999) and the officers' efforts to discourage petitioner's requests, the determination that petitioner waived his right to have counsel present at questioning is unreasonable.

D. The Admission of the Interrogations Was Prejudicial Error Warranting Relief.

As explained in Argument II, Part C, the interrogations had a substtial and injurious effect or influence in determining the jury's verdict. That argument is incorated here by reference.

II.    THE TRIAL COURT ERRED AND VIOLATED PETITIONER'S RIGHTS
       AGAINST SELF-INCRIMINATION AND TO DUE PROCESS BY ADMITTING
       INTO EVIDENCE THE POLICE INTERROGATIONS BECAUSE PETITIONER'S
       RESPONSES WERE NOT VOLUNTARY.

A. The Law Regarding Voluntariness of Defendants' Statements

An involuntary confession is inadmissible under the Due Process Clause of the United

States. U.S. Const. Amds. 5, 14; *Jackson v. Denno,* 378 U.S. 368, 385-386 (1964). Before a

defendant's statement may be admitted into evidence, the prosecution must prove by at least a

preponderance of the evidence that the statement was voluntary. *Lego v. Twomey,* 404 U.S. 477,

489 (1972). "A confession may be found involuntary if extracted by threats or violence,

obtained by direct or implied promises, or secured by the exertion of improper influence."

*People v. Maury,* 30 Cal.4th 342, 404 (2003). In addition to the crucial fact of police coercion,

*Colorado v. Connelly, supra,* 479 U.S. at p. 167, factors to consider are the length of the

interrogation, *Ashcraft v. Tennessee,* 322 U.S. 143, 153-154 (1944), its location, see *Reck v.*

*Pate,* 367 U.S. 433, 441 (1961), its continuity, *Leyra v. Denno,* 347 U.S. 556, 561 (1954), the

defendant's physical condition, *Greenwald v. Wisconsin,* 390 U.S. 519, 520-521 (1968) (per

curiam), and his mental health, *Fikes v. Alabama,* 352 U.S. 191, 196 (1957).

The court must examine "all the surrounding circumstances--both the characteristics of

the accused and the details of the interrogation" *Schneckloth v. Bustamonte,* 412 U.S. 218, 226

(1973) "to determine whether a confession had been 'made freely, voluntarily and without

compulsion or inducement of any sort.' [citation]" *Withrow v. Williams,* 507 U.S. 680, 689

(1993). A statement is involuntary if, as a result of police coercion, it is not the product of "a

rational intellect and free will." *Mincey v. Arizona,* 437 U.S. 385, 398 (1978); *Lynumn v.*

*Illinois,* 372 U.S. 528, 534 (1963). "[P]sychological ploys which, under all the circumstances,

1

2

3  are so coercive that they tend to produce a statement that is both involuntary and unreliable" will

4  render a statement inadmissible. *People v. Thompson,* 50 Cal.3d 134,166-167 (1990).

5  B. The Decision is Based on an Unreasonable Determination of the Facts and Contrary To Clearly Established Federal Law.

6  The state courts unreasonably determined that petitioner's statements were voluntary.

7  Besides rebuffing petitioner's attempts to obtain a lawyer, the police exerted unrelenting

8  psychological pressure upon a mind weakened (as they knew) by methamphetamine intoxication,

9  sleep deprivation, and the coercive atmosphere of the custodial interrogation, and procured

10  admissions that are neither voluntary nor reliable.

11  Petitioner was subjected to two lengthy back-to-back interrogations while handcuffed in a

12  small interrogation room. (1RT 45, 2RT 253-254).) At the time of the interrogations, he was

13  sleep-deprived (2RT 264) and suffering the effects of methamphetamine consumption. During

14  his interview with petitioner, Officer Richard Bravo believed petitioner to be behaving weirdly

15  and under the influence of a stimulant. (1RT 62, 63.) In the interview, petitioner informed the

16  police that he had used methamphetamine about an hour earlier, or before he had contact with

17  the police. (2CT 116-117.) Petitioner testified that prior to the arrest in this case, he had

18  consumed about one and three quarter grams of methamphetamine and was not thinking clearly.

19  (2RT 265, 268.) Listening to the tape recording, petitioner noted indications that he was

20  "wasted." (2RT 297.)

21  The transcripts of the interrogations reveal that petitioner was confused, hallucinating,

22  and paranoid. ("I know there's games going on. (1CT 122.) "Consistent patterns .. of, ah,

23  somebody's playing tricks on you." (1CT 126.) "There's ah there's networks and something

24  going on out there big time." (1CT 164.) "I saw the networks materialize before my eyes." (1CT

25  167.) Petitioner told the police, in the second conversation, that he went next door to find a piece

26

27  Williams Petition for Habeas Corpus Memorandum of Points and Authorities, page 8

of the puzzle, having to do with the movement of people, which indicated a sex ring in which the CIA was involved, which was tied up with the concept of God and the whole surveillance system, which somehow prevented him from having any success with women, and that he believed that if he went over to the Bauers' house he might obtain some information having to do with DNA which would explain why he is so unsuccessful with women. (2CT 186-189, 191-192, 198-199.) These statements suggest that petitioner was intoxicated (or perhaps psychotic). Indeed, petitioner was *so* intoxicated (or psychotic) that he did not perceive that the officers who questioned him in the second interview were different from *the* officers in the first interview. (2RT 266.)

Petitioner displayed a heightened religiosity during the questioning. He stated that he was trying to do God's will (CT 112-113); and sometimes has to sacrifice himself (1CT 113); that God would handle it (1CT 115); that "I don't fucking matter really" (1CT 150); called for God to enter the room (1CT 160); said that "the psychology of this whole God thing has … affected my mind (inaudible)" (1CT 176); and spoke of "the whole concept of God the surveillance system everything." (1CT 189.) At one point petitioner asked one of the officers if he worked with God. (1CT 215.)

Despite these indications that petitioner was not in a coltion to answer questions, the police subjected him to two lengthy interrogations focused obsively on the subject of sex with children. They told petitioner that girls aged ten to twelve know right from wrong and can say yes or no (1CT 158); that there is nothing wrong with liking younger girls (1CT 161); that there is no problem with having sex with a fifteen-year-old if she is ling (1CT 159); that petitioner should consider the question of sex with a willing fifteen-year by "tak[ing] away" the objections petitioner raised about the psychological issues and possibility of disease (*ibid.*);

Williams Petition for Habeas Corpus Memorandum of Poi·d Authorities, page 9

and that a typical red-blooded American is a horny man (1CT 174). They also told him that someone who is on crank has an out-of-body experience in which he cannot control his body (1CT 160) and that this is petitioner's chance to get help. *(Ibid; also* 1CT 170.)

The police agreed with petitioner that sometimes people have to sacrifice themselves. (1CT 113.) They assured him that God works in mysterious ways and never gives us more than we can carry. (1CT 114-115.) They assured him that God was in the room with the three of them, watching. (1CT 160.) They did, however, deny working with God. (1CT 215.)

The police disregarded petitioner's statements of non-felonious reasons for entering the Bauers' house. Petitioner tried to explain that he had heard somebody calling and went to look for anybody, for some sign of people living there (1CT 124-125), that he "was actually trying to find out where they were staying (1CT 132, see also 1CT 159) and that there was something wrong at the Bauers' house (1CT 168). The police suggested to petitioner that he might have wanted to touch Mrs. Bauer without waking her up (1CT 121)[1], that he was in the mood for love when he went next door (1CT 132), that the puzzle he was trying to solve by going over there "has something to do with why you can't get laid." (1CT 144.) The police suggested to petitioner that he feels intense sexual desire when he is under the influence of methamphetamine. When petitioner said that he gets bold when he is on methamphetamine, Officer Aviles added, "And horny," a suggestion to which petitioner assented. (1CT 145.)

The police suggested to petitioner that he desires underage girls when he is under the influence of methamphetamine. (1CT 157.) When petitioner denied that he aims for underage girls, saying "[t]he kids were more important than me," Officer Aviles reiterated that petitioner likes young girls when he is on crank, and petitioner agreed. (1CT 158.) The police told

---

[1] The transcript says "without beating her up," but petitioner then said, as if repeating what the officer had said, "Touch her without waking her up. Yeah. (Inaudible) …" (1CT 121.)

petitioner that he likes girls aged from about ten to twelve years old. (1CT 158.) Subjected to
this barrage of sex-obsessed questions and assertions, petitioner admitted that "when I spin out
on crank, I try to fuck anything, …." (1CT 147); that "I'm just out to have sex with anybody
that's willing" (1CT 152); that he tends to like young girls when he's on crank (1CT 158); that
he has touched young girls in the past (1CT 150); and that "you could say I'm ah, a child
molester." (1CT 160.) The police also suggested that petitioner might go back and visit the
Bauers some day. (1CT 165.) When petitioner disagreed, Officer Bravo repeated the suggestion
and said "I know this to be true." (1CT 167.) When petitioner again denied that he would return
to that house, Bravo said "You did it tonight, so, you know, why not again?" (1CT 167.)

Officer Aviles again told petitioner that "crank makes your inhibitions go down," and
went on to say "And like I said, it's okay to like young girls. Nothing wrong with it." (1CT
169.)

Asked what he had done prior to going to the Bauers' house, petitioner spoke about
walking around the neighborhood. (1CT 199-200.) Officer Moore suggested that petitioner was
"looking for pussy in the windows" to which petitioner responded "probably." (1CT 200.)
Although petitioner denied going next door to have consensual sex with Terry (Mrs. Bauer)
(1CT 136), he eventually agreed that he would have had sex with her if she was willing. (1CT
178.)

Despite the officers' persistent efforts to get petitioner to say that he entered the house to
have sex with the Bauers' twelve-year-old daughter, petitioner never agreed with that assertion.
(See, e.g., 2CT 213-214, 216, 217, 218-219, 221, 222.) The police were successful, however, in
getting enough suggestive statements from petitioner to cause the jury to conclude that petitioner
intended to commit a sexual assault at the Bauers' home.

The psychological ploys the police used may well have influenced the course of petitioner's methamphetamine-fueled fantasies. The officers' questions and suggestions forced petitioner's confused thoughts to turn repeatedly to sex in general and sex with children in particular. Support for the possibility that petitioner may have incorporated the officers' suggestions into his delusions can be seen in petitioner's answer to the question why he would think that there was a sex ring involving children in the sealed chamber he thought he discovered at the Bauers' house. Petitioner's response was "Uh, the balance of everything that's going on seems to involve kids." (1CT 207.) Of course, what was going on was that the police were interrogating petitioner in a highly suggestive manner, and the balance of the questions and suggestions involved children and sex. Thus, petitioner's responses to the officers' questions may well have been, in significant measure, fantasies shaped and directed by the officers' questions and suggestions.

The totality of the circumstances reveal that petitioner's admissions were not voluntary and the state courts' contrary determination was unreasonable.

C. The Admission of the Interrogations Was Prejudicial Error Warranting Relief.

The interrogations had a substantial and injurious effect or influence in determining the jury's verdict. Without petitioner's statements in the interrogations, it is inconceivable that the jury would have had found petitioner guilty of burglary.

The facts of the offense supply no evidence of such intent. Petitioner made a good deal of noise before he entered the home, turning on a radio, running on the roof and jumping. (3RT 563-564.) Once in the house, he made no effort to assault anyone. When Mrs. Bauer saw petitioner and screamed, petitioner moved away from her, backing into a bedroom, where he lay on the bed with his hands behind his head. (4RT 805.) When petitioner was searched, he had no

weapons or ropes or burglary tools on him, and nothing was missing or disturbed. (4RT 818-819, 827-828.) The uninvited early morning entry by itself does not support a rational inference of the intent to commit a violation of Penal Code section 220 or any felony, especially given that petitioner was under the influence of methamphetamine. Intoxicated people do irrational things.

Even supplemented by the stipulation that in 1993 petitioner was convicted of a misdemeanor violation of section 647.6, annoying or molesting a child (6RT 1014), the evidence does not support a rational conclusion that petitioner intended to commit a sexual felony. Evidence of another sexual assault linked to a charged assault, combined with other evidence of the intent to commit a sexual assault, may suffice to prove the intent to commit a sexual assault. *People v. Holloway,* 33 Cal.4th 96, 138 (2004). But where there is no evidence that the charged offense involved an intended or attempted sexual assault, evidence of a prior sexual assault cannot rationally substitute for the missing evidence. See *People v. Guerrero,* 16 Cal.3d 719, 727-728 (1976). Moreover, the fact that a decade previously petitioner was convicted of the misdemeanor of annoying or molesting a child cannot give rise to a reasonable inference that he intended to commit a sexual felony in the Bauers' home. Annoying or molesting a child does not even require any touching (see *People v. Mendoza,* 118 Cal.App.4th 571, 573, 576 (2004) [verbal proposition of minor]), although the crimes petitioner was alleged to have intended to commit in the Bauers' house required touching. The parties' stipulation regarding the section 647.6 conviction (6RT 1014) did not include any acknowledgement of touching.

The bulk of the prosecutor's arguments was devoted to the interrogations, a fact which reveals how critical those interrogations were to his case. Again and again, the prosecutor relied on the interrogations for proof of the intent to commit a sexual assault. (Aug. RT 3/12/04 [hereafter Aug. RT] 46-65, 128-132, 135, 137.) For instance, he told the jury "Did he have a

specific intent? He tells you that on the tape:  Why did you go over there? I went over there for sex. I went over there for the P word. I went over there because I hadn't been getting laid." (Aug. RT 130.)  As discussed in the argument on prosecutorial misconduct *infra*, this was not an accurate paraphrase. Here and elsewhere, as detailed *infra*, the prosecutor took advantage of the ambiguities in the transcripts and urged the jury to draw unwarranted inferences.

The prosecutor's arguments to the jury reveal the critical importance of the interrogations to the prosecutor's case. Indeed, as the prosecutor told the court with respect to one response petitioner made during the interrogations, to the effect that methamphetamine is a male aphrodisiac and that petitioner has had experiences of wanting to have sex with somebody that he wasn't supposed to have sex with (1CT 161-162), "We might as well call it a day to the extent that's going to be tossed out. That's everything that this is about. … That absolutely has to come in." (4RT 871.)  The prosecutor thus acknowledged that the interrogations were indispensable to his case.

Without the improperly admitted evidence, the evidence showed merely that petitioner, high on methamphetamine, committed the misdemeanor of trespassing in his neighbor's house, an offense that would have led to no more than a $1,000 fine and a year in jail (Calif. Pen. Code § 602.5, subd. (b)) instead of the sentence of twenty-five years to life that petitioner received under the Three Strikes Law. Calif. Pen. Code §§ 1170.12, subds. (a)-(d), 667, subds. (b)-(i). The interrogations thus had a substantial and injurious effect or influence in determining the jury's verdict, petitioner is entitled to the writ. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).

1

2

3

III.   THE CONVICTION FOR BURGLARY WAS UNSUPPORTED BY THE EVIDENCE AND VIOLATED PETITIONER'S DUE PROCESS RIGHTS.

4

Under *Jackson v. Virginia,* 443 U.S. 307 (1979) the "critical inquiry" when assessing a

5

claim of insufficient evidence in a habeas corpus challenge to a state conviction is "whether the

6

record evidence could reasonably support a finding of guilt beyond a reasonable doubt," i.e.,

7

whether, "after viewing the evidence in the light most favorable to the prosecution, any rational

8

trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

9

(*Id.* at pp. 318-319.)

10

Petitioner was convicted of burglary, section 459, by entering the Bauers' home with the

11

intent to commit therein a felony, namely, a violation of section 220, assault "with intent to

12

commit mayhem, rape, sodomy, oral copulation, or any violation of Section 264.1, 288 or 289."

13

To be guilty of burglary, the defendant must have unlawfully entered a dwelling with the intent

14

to commit larceny or any felony.  Calif. Pen. Code § 459; *People v. Montoya,* 7 Cal.4th 1027,

15

1041 (1994).

16

The evidence was not sufficient to show that petitioner intended to commit a violation of

17

section 220 or any other felony or larceny when he entered the Bauers' home.

18

The facts of the offense supply no evidence of such intent.  Petitioner made a good deal

19

of noise before he entered the home, turning on a radio, running on the roof and jumping. (3RT

20

563-564.)  Once in the house, he made no effort to assault anyone.  When Mrs. Bauer saw

21

petitioner and screamed, petitioner moved away from her, backing into a bedroom, where he lay

22

on the bed with his hands behind his head.  (4RT 805.)  When petitioner was searched, he had no

23

weapons or burglary tools on him.  (4RT 818.)  He had no rope or tools and nothing was missing

24

or disturbed.  (4RT 819, 827-828.)  The uninvited early morning entry by itself does not support

25

a rational inference of the intent to commit a violation of section 220 or any other felony or

26

27

Williams Petition for Habeas Corpus Memorandum of Points and Authorities, page 15

larceny, especially given that petitioner was under the influence of methamphetamine. Intoxicated people do irrational things.

Even supplemented by the stipulation that in 1993 petitioner was convicted of a misdemeanor violation of section 647.6, annoying or molesting a child (6RT 1014), the evidence does not support a rational conclusion that petitioner intended to commit a sexual felony. Evidence of another sexual assault linked to a charged assault, combined with other evidence of the intent to commit a sexual assault, may suffice to prove the intent to commit a sexual assault. *People v. Holloway, supra,* 33 Cal.4th at p. 138. But where there is no evidence that the charged offense involved an intended or attempted sexual assault, evidence of a prior sexual assault cannot rationally substitute for the missing evidence. See *People v. Guerrero, supra,* 16 Cal.3d at pp. 727-728. The fact that a decade previously petitioner was convicted of the misdemeanor of annoying or molesting a child cannot give rise to a reasonable inference that he intended to commit a sexual felony in the Bauers' home. Annoying or molesting a child does not even require any touching, see *People v. Mendoza, supra,* 118 Cal.App.4th at pp. 573, 576 (2004) (verbal proposition of minor), although the crimes petitioner was alleged to have intended to commit in the Bauers' house required touching. Whether the offense that gave rise to petitioner's section 647.6 conviction involved touching is not clear. The parties' stipulation regarding the conviction (6RT 1014) did not include any particulars. Although that conviction was mentioned in the police interrogations, it is unclear whether petitioner's statement in the interrogation that he touched a girl without sexual intent (1CT 150) pertained to the section 647.6 conviction.

The only evidence, apart from the prior conviction, offered with respect to petitioner's intent was the tapes and transcripts of the police interrogations. Even if petitioner made

Williams Petition for Habeas Corpus Memorandum of Points and Authorities, page 16

admissions during those interrogations that, if reliable, would supply the evidence necessary for an inference of the prohibited intent, the evidence remains insufficient because no rational factfinder could find petitioner's statements during those interrogations to be reliable. As discussed in the preceding section, petitioner was suffering from methamphetamine intoxication and subjected to questioning that repeatedly brought before his mind images of sexual activity and children. Petitioner was evidently out of touch with reality, fantasizing about the CIA, about being followed, about sex rings involving children. No rational factfinder could be confident that anything petitioner reported in those interviews was true.

Because no rational factfinder could draw from petitioner's responses to the police interrogations inferences supporting the finding that, when he entered the Bauers' house, petitioner intended to commit any of the allegedly intended crimes, relief is available on habeas corpus. *Jackson v. Virginia, supra,* 443 U.S. at p. 319.

IV.   THE TRIAL COURT VIOLATED PETITIONER'S DUE PROCESS RIGHTS BY ADMITTING EVIDENCE OF A PRIOR SEXUAL OFFENSE AND UNRELIABLE EVIDENCE CONTAINED IN THE TAPES AND TRANSCRIPTS OF THE POLICE INTERROGATIONS.

A. The Tapes and Transcripts of the Interrogations Were So Unreliable and Inflammatory that their Admission Infected the Trial with Unfairness.

A trial court's evidentiary ruling may violate the United States Constitution if it denies the defendant the fundamentally fair trial guaranteed by the due process provisions of the Fifth and Fourteenth Amendments. *Pulley v. Harris* 465 U.S. 37, 41 (1984); *Walters v. Maass,* 45 F.3d 1355, 1357 (9th Cir. 1995). "[T]he Fourteenth Amendment forbids 'fundamental unfairness in the use of evidence whether true or false.'" *Blackburn v. Alabama,* 361 U.S. 199, 206 (1960), quoting *Lisenba v. California,* 314 U.S. 219, 236 (1941). Just as the due process clause precludes the jury from convicting on unreliable identification evidence, see *Manson v.*

Williams Petition for Habeas Corpus Memorandum of Points and Authorities, page 17

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

*Brathwaite,* 432 U.S. 98, 116 (1977) (substantial likelihood of irreparable misidentification may render trial so unfair as to deny due process); *United States v. Kerr,* 876 F.2d 1440, 1445 (1989) (reliance on false or unreliable evidence violates due process), so the due process clause precludes the jury from convicting upon such unreliable evidence of petitioner's intent on entering the Bauer home as is presented in this case.

A prior sex crime is useless to prove intent if there is no evidence that the charged crime was a sexual offense. *People v. Guerrero, supra,* 16 Cal.3d 719. Based on the mere fact that there was a young girl in the house, the People conjured up an intent on petitioner's part to commit a sexual assault in order to introduce evidence of the earlier child molestation conviction and petitioner's statements regarding prior incidents with young girls. If it had been in the state's interest, law enforcement could have hypothesized that petitioner intended to commit larceny in the Bauer home, despite the lack of any evidence that petitioner tried to take anything, questioned petitioner persistently about his interest in money and goods, obtained acknowledgements about how nice it is to possess money and goods, and then adduced petitioner's prior theft crime in an attempt to prove the intent to commit a theft offense. Alternatively, if burglary could be committed by entering a home without permission while under the influence of an intoxicating substance that prevented the formation of any criminal intent, the police and prosecutor could have focused on petitioner's intoxication and confused mental state, and demonstrated the lack of intent by the absence of evidence of any attempt to commit a crime in the residence. Or, if it had been in the interest of the police and prosecution to pursue such a possibility, they could have hypothesized an intent to watch television at the Bauers', questioned petitioner about his television preferences, and then adduced prior instances of watching television to support an inference that he entered the Bauers' house with the intent to

Williams Petition for Habeas Corpus Memorandum of Points and Authorities, page 18

watch television. The police and prosecutor could as readily have poured one possibility as another into this gaping hole in the evidence.

Except for the prior section 647.6 offense, there is no evidence independent of petitioner's statements in the interrogations that prior sexual offenses even occurred, and petitioner's own statements are too confusing and unreliable to give any assurance that they *did* occur. In addition, petitioner's vague and confusing allusions to partying or getting close to children in the past did not supply enough information to allow the court to ascertain when those incidents occurred (assuming they occurred at all) or whether they bore sufficient similarity to the charged crime to have any probative value. The probative value of the interrogations of petitioner was virtually nil. Petitioner was under the influence of methamphetamine; his requests for a lawyer were rebuffed; and his will was overborne by the psychological ploys of the police officers. There was no evidence, with respect to any of the possible priors, of reliability, recency, or similarity. There is nowhere in the evidence any suggestion that petitioner had ever committed any of the crimes – rape, any unlawful sodomy, any unlawful oral copulation, or (apart from some ambiguous statements in the interrogations) any lewd act on a child under the age of fourteen – that he was alleged to have intended to commit in the Bauer home.

The recorded interrogations are extremely ambiguous, confusing, and misleading. Asked about his prior offense, petitioner replied "there's an accusation that I touched a seven year old girl in a sexual manner" (1CT 145), but it is unclear whether that is the accusation resulted in his child molestation conviction, or whether this was some other, perhaps never substantiated, accusation. Later, he was asked, "Eight year olds that maybe didn't want to be touched, that you touched? They all wanted to be touched?" and petitioner said "Well, the one that I'm talking about" (1CT 155) which could be understood by the jury as a reference to a girl other than the

seven-year-old previously mentioned, although it is not clear whether there was ever any sexual molestation of any eight-year-old girl. Petitioner spoke of "a relapse" which could mean a drug relapse or a sexual relapse. (1CT 155.) Asked who the girl was, petitioner spoke of someone named Denise, and then said he has known her since childhood. (1CT 155.) Whether petitioner himself was an adult or a child at the time is unclear. Petitioner also said that he had hooked up with his former girlfriend when she was 17 (1CT 163), but it is not clear how old petitioner himself was at that time.

Asked if he had gone next door to rape the little girl, petitioner answered that 18 years of age is the (presumably lower) limit, and then spoke of the problems that arose in his marriage because he partied with children, including his wife's sixteen-year-old daughter. (1CT 128.) "And we were too close together," he said. (1CT 128.) He said that he "hit on" the girl, but denied that he did anything. (1CT 129.) What petitioner meant by "hit on" is unclear. Nonetheless, the prosecutor relied on this passage in oral argument, saying "And at the bottom of page 18 [1CT 128] he starts talking about minors. 18 is the limit but 16-year-old, good. And he's been engaged in situations like that when he's on meth, which is what we have here." (Aug. RT 51.)

Petitioner told the police he had been arrested the previous day "for under the influence. And ah, 1-5-50." (1CT 132.) The reference is surely to California Health and Safety Code section 11550 (use of controlled substances), but the jury may have understood petitioner to be speaking of two offenses, 1) being under the influence and 2) another crime, numbered 1-5-50, perhaps having to do with a sexual offense. The confusion is compounded by what follows. Bravo asked petitioner "So, you got out, and you went and did more, more of what got you arrested in the first place?" Petitioner answers "Yep. For a reason," and then gives the reason as

Williams Petition for Habeas Corpus Memorandum of Points and Authorities, page 20

"I've been running around trying to get laid for years." (1CT 132-133.) The prosecutor quoted some of this discussion to the jury in oral argument as support for the conclusion "This was about a sexual assault" (Aug. RT 51-52), an argument that could only have exacerbated the confusion.

Also, the police asked petitioner about "the 290." (1CT 163.) California Penal Code section 290 requires registration of convicted sexual offenders. The jury, unlikely to know that, might have supposed the 290 was yet another sexual offense of which petitioner was convicted.

Thus the jury might have supposed from the interrogations that petitioner has sexually assaulted children repeatedly and as recently as the previous day. Petitioner's answers to the officers' questions are so ambiguous and confusing, however, that no valid inference about prior sexual offenses can reliably be drawn.

The questions posed by the police also could have led the jury to believe that the police had information about other sexual offenses. After asking petitioner if the young girl at the Bauer house had anything to do with his going to the house (to which petitioner responded, "No"), Aviles said "There's not gonna be another one of those accusations where, maybe you went to the house and you're looking for some ten year old girl, and then you touch her" (1CT 145), implying falsely that there had been accusations in the past that petitioner entered houses and touched ten-year-old girls.

The unreliability of the interrogations is compounded by the frequent redactions, blazoned by ominous black ink, which were bound to incite speculation, regardless of any admonition (see 5RT 902) to disregard them.

The frequent inaudible portions also invite speculation, and may easily distort the meaning of the passages that follow them. When petitioner spoke of his wife's daughter, Bravo

asked "did you kiss her, fondle her, touch her breasts?" and petitioner's response is given as "I (inaudible). Yeah, I did. But ah, no, I never ah, ..." (1CT 129.) The jurors might have interpreted the words "Yeah, I did" as in answer to Bravo's question, although those words cannot reliably be understood without knowing what was in the inaudible portion.

At another point, after some inaudible conversation, Aviles asked petitioner whether the crank was starting to get control over petitioner, and petitioner answered "No." (1CT 116.) Because some of it is inaudible, it is unclear whether this discussion pertained to petitioner's condition when he had been using methamphetamine in the past (i.e., prior to his six "clean" years) or to his current condition. Nonetheless, in oral argument the prosecutor relied heavily on petitioner's assertion that he "got that under control" (1CT 116) as an admission that petitioner could not claim that, due to the methamphetamine, he did not know what he was doing when he entered the Bauers' home. (Aug. RT 47.)

At another point Officer Aviles said "(Inaudible) looking for women tonight" to which petitioner responded "Yeah." (1CT 168.) What "Yeah" means in that context cannot be determined.

Aviles also said "crank makes your inhibitions go down," and went on to say "And like I said, it's okay to like young girls. Nothing wrong with it. All right. But you (inaudible) the (inaudible). You and I both know that. Okay? Am I correct?" to which petitioner responded "Correct." (1CT 169.) Although the meaning of that response is hopelessly indeterminate, it invites the speculation that petitioner was agreeing that he sometimes overstepped the bounds with young children.

Bravo asked petitioner "Were you (Inaudible) get a little better about Terry. (Inaudible) can see Terry wanted to have sex with you, ask her? And petitioner said "Ahhh, no, I wouldn't

Williams Petition for Habeas Corpus Memorandum of Points and Authorities, page 22

think so." (1CT 135.) The prosecutor argued that this passage constituted an admission by petitioner that he wasn't planning on asking Mrs. Bauer to have sex with him, that "this wasn't about consensual sex" (Aug. RT 52), but the meaning is unclear due to the inaudible portions.

In the second interview, Moore told petitioner "I think the puzzle is this twelve year old girl's pussy Greg." (1CT 221.) Petitioner said something inaudible and Moore said "Okay. That's what I think. Tell me I'm wrong." Petitioner said "You're wrong." (1CT 221.) Moore asked "What's the puzzle?" and petitioner responded "That's a good question." Moore then said "You see. (Inaudible). I do have an answer." Petitioner then said "(Inaudible) it's a twelve year old pussy." (1CT 221.) Although petitioner's response is probably an acknowledgement that Moore's answer to the question "What's the puzzle?" is "a twelve year old pussy," the jury might have thought petitioner was stating his own answer to that question.

Besides the problem of the confusion caused by the inaudible and redacted portions is the problem of words whose meaning is unclear. At one point petitioner said "and I didn't get laid. And that's what triggers me to go get hooked up." (1CT 156.) Whether by "hooked up" he meant finding a woman willing to have intercourse or using methamphetamine is unclear. Petitioner then went on to say "'Cause I try and break in. I'll try and do it again. I'll try and do it again." (1CT 156.) Again, petitioner's meaning is unclear. By "break in" he may have meant to break into a relationship, or into a conversation, or break through a woman's reservations, but the jury might have supposed that he was speaking of burglaries. The prosecutor quoted this language, telling the jury "it … sounds like he's describing his conduct." (Aug. RT 56.)

There is also the problem that, in conversations in general, words like "yeah" are sometimes used to indicate that the listener is paying attention and thereby to encourage the speaker to complete his thought, and at other times to express agreement with the speaker. When

Aviles spoke of sex with a physically mature fifteen-year-old and told petitioner to "take away" the issues of her psychology and the possibility of disease, called that "normal sex," and suggested that "that's no problem if she's willing," petitioner eventually said "Well, yeah." (1CT 158-159.) Petitioner's words do not admit of any reliable interpretation but may have been understood by some jurors as assent to the proposition that sex with a 15-year-old is permissible.

Another problem is that the transcripts do not reliably report who is speaking. Detective Bravo testified that it was Sergeant Aviles who made the comment about God working in mysterious ways (5RT 948), although the transcript attributes that comment to Bravo. (1CT 115.) Detective Pierce testified that there are instances where the transcript indicates that it is Detective Moore speaking, but it is actually Pierce. (6RT 1002-1003.) In the first interrogation, the transcript attributes to Aviles the words "Well, there's no law, 24-hour law, (inaudible) what we do. The process of recovery, he tells God. 'Cause God takes us through learning experiences (Inaudible). And these, these experiences are positive and negative. And you're left with choices." (1CT 127.) The incoherence of the statement suggests that it was petitioner, not Sergeant Aviles, who said that. Also in the first interview, the transcript shows petitioner answering the question of whether he made eye contact with anyone at the Bauers' house with the words "Oh, actually, um, Terry, Terry did get a glimpse of him." (1CT 140.) Petitioner does not refer to himself in the third person anywhere else in the interview, so either these words were uttered by one of the officers or the transcription is simply wrong. In the second interview, the transcript attributes to petitioner the words "Did you attract attention?" (1CT 206) although that question was almost certainly posed by one of the officers. These errors of attribution suggest that there may be other such errors, and that comments that are presented as admissions by

petitioner may actually have been accusations by the officers. The inability to reliably identify the speakers vitiates any probative value the tapes and transcripts might have.

The error in admitting the tape and transcripts is revealed by the court's own acknowledgement that petitioner is an unreliable reporter. At the conclusion of the hearing on the admissibility of the interrogation tapes and transcripts, the court noted differences between petitioner's testimony and that of the officers and concluded that petitioner is "not a good factual reporter." (2RT 323.) "And to the extent that he's not a good factual reporter, I think that raises some questions about his ability to be a mental status reporter, in other words reliably telling us what he thought or felt at the time of the interview." (2RT 323.) If the court doubted petitioner's ability to be a mental status reporter during the hearing, when petitioner was not under the influence of methamphetamine, the court could not rationally conclude that petitioner was a reliable mental status reporter during the interrogations, when he *was* under the influence. The unreliability of petitioner's answers to the officers' questions about his mental state deprive any admissions he made during the interrogations of any probative value.

For all these reasons, the tapes and transcripts and the evidence of the prior section 647.6 conviction lack probative value. This evidence was inflammatory, however. The jury was informed that the police had inferred, from unspecified sources, that petitioner prefers girls of ten to twelve years old. Although, as noted above, much of what petitioner said is impossible to understand, the jury may have obtained the impression that petitioner has frequently sexually abused underage girls and has a particular affinity for ten to twelve-year-old girls. They could infer that the police had not previously been aware of the incidents petitioner alluded to, and further infer that, with the exception of the prior section 647.6 offense, petitioner had not been punished for any of them. The evidence of unpunished prior offenses "increased the danger that

the jury might have been inclined to punish defendant for the uncharged offenses, regardless whether it considered him guilty of the charged offenses," *People v. Ewoldt,* 7 Cal.4th 380, 404 (1994), which would deprive petitioner of his fundamental rights to prior notice of the charges, *Bousley v. United States,* 523 U.S. 614, 618 (1998), a speedy trial of those charges, *Barker v. Wingo,* 407 U.S. 514, 515 (1972), and acquittal absent a jury's determination of guilt beyond a reasonable doubt. *In re Winship,* 397 U.S. 358, 364 (1970); *Duncan v. Louisiana,* 391 U.S. 145, 148-149 (1968).

The jury learned that petitioner does not know whether his blood is clean. (1CT 177.) They were exposed to Moore's opinion that petitioner broke into the house because he was "going to go after their little girl …" (1CT 218) and to Bravo's certainty that petitioner would go to the Bauers' house again. (1CT 167.) The tapes and transcripts also reveal petitioner's mental confusion and delusions, which may well have caused the jury to want him removed from society whether he committed a burglary or not. The shockingly vulgar language, the preoccupation with sex with children (a preoccupation that is due to the officers' choice of questions), the confusing and unreliable statements about prior sexual acts with children, the ominous blacked-out segments, and the persistent depiction of petitioner as that most reviled and feared figure, the repeat child molester, could not but inflame, horrify, and prejudice the jury.

The inflammatory and prejudicial character of the interrogations so far outweighed their negligible probative value as to amount to a "failure to observe that fundamental fairness essential to the very concept of justice." *Lisenba v. California*, *supra*, 314 U.S. at p. 236. The admission of that evidence violated the fundamental fairness guaranteed by the due process clause.

1
2
3     B.  The Admission of the Interrogations Was Prejudicial Error Warranting Relief.

4         As explained in Argument II, Part C, the interrogations had a substantial and injurious

5     effect or influence in determining the jury's verdict.  That argument is incorporated here by

6     reference.

7     V.      THE PROSECUTOR ENGAGED IN MISCONDUCT THAT VIOLATED
              PETITIONER'S DUE PROCESS RIGHTS.

8         A.  Misconduct by the Prosecutor Rendered the Trial Fundamentally Unfair.

9         In the interrogations, the police told petitioner that there is no problem with having sex

10    with a fifteen-year-old if she is willing (1CT 158-159) and that petitioner should consider the

11    question of sex with a willing, physically mature fifteen-year-old by "tak[ing] away" the

12    objections petitioner raised about the psychological issues and the possibility of disease." (*Ibid.*)

13    Petitioner eventually responded "Well, yeah," (1CT 158-159), which might indicate assent to the

14    officers' limited suggestion (that, in the abstract, there could be no wrong if you remove the

15    possibility of disease and the psychological issues) or might indicate that petitioner was just

16    encouraging the officers to continue their discussion.  Nonetheless, the prosecutor told the jury

17        Then he talks about having sex with a 15-year-old at the bottom of Page 55 [I CT
          158].  Where he hmms and haws about it, middle of Page 56.  But ultimately he
18        says oh, yeah, yeah.  Well, yeah.  Excuse me, I misspoke.  Well, yeah, sex with a
          15-year-old.
19                    (Aug. RT 57.)

20        The prosecutor implied that petitioner hemmed and hawed before admitting that he had

21    sex with a fifteen-year-old, but petitioner never made such admission, nor did he approve of

22    sexual intercourse with fifteen-year-olds.  (Aug. RT 57.)  The prosecutor also said, "He tells you

23    that he's not averse to engaging in sex with minors." (Aug. RT 57.)  Petitioner did not say that

24    either.  The discussion about sex with a fifteen-year-old (which Aviles introduced, 2CT 158)

25
26
27    Williams Petition for Habeas Corpus Memorandum of Points and Authorities, page 27

1

2

3    does not support the inferences that petitioner ever had sex with a fifteen-year-old or that he is

4    not averse to having sex with a fifteen-year-old.

5        The prosecutor also stated in rebuttal argument (Aug. RT 129) that petitioner said that

6    under the influence of methamphetamine he likes girls, "the younger the better." Petitioner

7    actually said "the younger, the better, *provided they're old enough.*" (1CT 54. Emphasis added.)

8        The prosecutor also told the jury, "in the second interview, he comes close to telling the

9    officer that the real reason may not have been for Terry" (*i.e.*, Mrs. Bauer, thereby implying that

10    petitioner entered his neighbors' house looking for their twelve-year-old daughter). (Aug. RT

11    57.) The prosecutor did not identify any portion of the second interview that would warrant that

12    characterization. The prosecutor thereby invited the jury to speculate about what petitioner

13    might have come "close to telling the officer."

14        The prosecutor told the jury to interpret petitioner's words to the police "I'm listening" as

15    an acknowledgement that the police were "getting warmer" and as an indication that the presence

16    of the 12-year-old girl at the Bauers' home was connected with petitioner's purpose in entering.

17    (Aug. RT 48, 64.) The prosecutor used petitioner's comment that the daughter is not as good

18    looking as her mother as evidence that petitioner was thinking sexually about the daughter,

19    saying, "This is a child. Not as good looking as her mom? He's describing a child in that

20    fashion?" (Aug. RT 49.) Petitioner's comment, however, was in response to the officer's

21    question "She as good looking as her mom?" (1CT 119.)

22        In rebuttal argument, the prosecutor said "Did he have a specific intent? He tells you that

23    on the tape: Why did you go over there? I went over there for sex. I went over there for the P

24    word. I went over there because I hadn't been getting laid." (Aug. RT 130.) The prosecutor's

25    paraphrase is inaccurate. Petitioner did not say that he went over to the Bauers' house in order to

26

27    Williams Petition for Habeas Corpus Memorandum of Points and Authorities, page 28

have sex (although, prompted by the officers, he acknowledged that he might not be opposed, if the lady of the house were willing. (1CT 178)). He did appear to say that he went next door because he might find, by investigating the sex ring in the secret chamber, some information that might have something to do with DNA that would help him understand why he was not getting laid. (1CT 198-199.) This is quite different from the prosecutor's paraphrase.

Again, in closing argument, the prosecutor misstated petitioner's words, saying that petitioner spoke of "Trying to get in there to have sex, Page 41." (Aug. RT 137.) But petitioner did not say that he was trying to get into the Bauers' house to have sex. What he said was in fact the opposite: "It's not about trying to, trying to get in there to have sex." (1CT 220.)

The prosecutor also misused evidence that was admitted for a limited purpose. Defense counsel had objected to Officer Pierce's testimony that, in interrogating petitioner, he had felt no need to talk with a psychiatrist because "In my opinion, I believed that Mr. Williams was trying to manipulate the situation. I didn't think there was any need for a psychologist or doctor. He's been around the block. He knows what he's doing" and "it was obvious to us he's been in the situation before, and he was just trying to control the situation, control the interview to go the way he wanted it to go." (6RT 1008.) The court overruled petitioner's objection and motion to strike, but later gave this admonition

> During Officer Pierce's testimony today, when asked, he explained why he did or did not do certain things during his interview with the defendant. You should consider the officer's opinions of the defendant's veracity, responsiveness and mental state only as it helps you to understand the officer's actions, if you find that helpful, and not for any other reason. Specifically, it's entirely up to you to gauge the truthfulness of the defendant's statements made during the course of the interview. Further, and as we will cover more completely in your instructions tomorrow, the issue of whether or not the defendant actually had the required mental state for the crime of burglary is entirely for you to decide using the law and the principals [sic] that I will explain more completely tomorrow." (6RT 1032-1033.)

Despite the court's limitation on the use of this evidence, the prosecutor told the jury that the police were not buying petitioner's story. He quoted Detective Moore: "Seems like you got the scenario down" and "You sound like you have the whole thing planned out." (Aug. RT 60-61.) In closing argument the prosecutor repeated this view: "As I said, every officer that had contact with him in the tapes, they keep saying, You have the scenario played out; sounds like you thought this one through; you're going off on this tangent, and Officer Moore in particular is saying that's ridiculous. Come back. Moreover, none of that occurs in any kind of detail. The whole thing about the CIA is ridiculous." (Aug. RT 132.) The prosecutor also said to the jury, "Detective Pierce: Lucid, aware, knew what he was doing. We were focusing him back because we didn't believe he was being forthright with us. He was playing games." (*Ibid.*) The prosecutor exploited the objectionable quality of this evidence – the likelihood that the jury would treat the officers' statements in the transcripts as expert evidence about petitioner's mental state and credibility.

A defendant's due process rights are violated when a prosecutor's misconduct renders a trial "fundamentally unfair." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986), *Donnelly v. DeChristoforo*, 416 U.S. 637, 639-645 (1974). Here, the prosecutor misstated the evidence and his misconduct as a whole so infected the trial with unfairness as to make the conviction a denial of due process. See *ibid.* In determining whether misconduct rises to a level of a due process violation the court may consider (1) the weight of evidence of guilt, compare *United States v. Young*, 470 U.S. 1, 19 (1985) (finding "overwhelming" evidence of guilt) with *United States v. Schuler*, 813 F.2d 978, 982 (9th Cir.1987) (in light of prior hung jury and lack of curative instruction, new trial required after prosecutor's reference to defendant's courtroom demeanor); (2) whether the misconduct was isolated or part of an ongoing pattern, see *Lincoln v. Sunn*, 807

F.2d 805, 809 (9th Cir.1987); (3) whether the misconduct relates to a critical part of the case, see *Giglio v. United States*, 405 U.S. 150, 154 (1972) (failure to disclose information showing potential bias of witness especially significant because government's case rested on credibility of that witness); and (4) whether a prosecutor's comment misstates or manipulates the evidence, see *Darden v. Wainwright, supra,* 477 U.S. at 182. There was almost no evidence of petitioner's intent apart from the unreliable interrogations which the prosecutor distorted in argument. The misconduct was repeated throughout the argument rather than an isolated incident. The misconduct related to the crucial issue of intent, and the prosecutor misstated the evidence and misused evidence admitted for a limited purpose.

B. The Prosecutor's Misconduct was Prejudicial and Warrants Relief.

The misconduct had a substantial and injurious effect or influence in determining the jury's verdict, particularly when viewed in the context of the other trial errors enumerated in the petition. *Brecht v. Abrahamson, supra,* 507 U.S. 619, 637. As discussed above, the interrogations were themselves highly misleading and unfair; the prosecutor's characterizations of petitioner's responses were even more misleading and greatly exacerbated the unfairness. Petitioner's intent in entering his neighbors' home was the critical issue in the case and the misrepresentations led the jury to believe, falsely, that petitioner had admitted (or come close to admitting) that his intent in entering that home was to sexually assault the young girl.

## CONCLUSION

For the reasons stated above, petitioner respectfully requests that the Petition for Writ of Habeas Corpus be granted.

August 17, 2007                                    Respectfully submitted,

Maureen L. Fox
Maureen L. Fox
Attorney for Petitioner
Gregory Williams

Williams Petition for Habeas Corpus Memorandum of Points and Authorities, page 32

CERTIFICATION OF SERVICE

WILLIAMS v. HOREL                              No.

I, Maureen L. Fox, certify that on the date set forth below, I served the accompanying and MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PETITION FOR WRIT OF HABEAS CORPUS upon all parties by placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid, in the United States mail at Los Gatos, California, addressed as follows:

Dorian Jung
Deputy Attorney General
455 Golden Gate Ave, Ste 11000
San Francisco, CA 94102-3664
ATTORNEY FOR RESPONDENT

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on August 17, 2007, at Los Gatos, California.

_Maureen L. Fox_

Maureen L. Fox