Maureen L. Fox, SBN 172711
Attorney for Gregory Williams, Petitioner
PMB 431, 15732 Los Gatos Blvd.
Los Gatos, CA  95032
Tel:  (408) 358-2135
Fax:  (408) 228-0887
Email:  attorneyfox@verizon.net

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Gregory Williams, | ) |
| | ) |
| Petitioner, | ) NO.  C 07-04269 TEH |
| | ) |
| v. | ) PETITIONER'S MEMORANDUM |
| | ) IN SUPPORT OF TRAVERSE |
| Robert Horel, Warden | ) |
| | ) |
| Respondent. | ) |
| _____ | ) |

TABLE OF CONTENTS

                                                                                                               page

Table of Authorities    ii

Introduction    1

Argument

    I. The State Appellate Court Unreasonably Applied Clearly Established Federal Law By Rejecting Petitioner's Claim Of *Miranda* Error.    1

    II. The State Appellate Court Unreasonably Denied Relief On Petitioner's Claim That His Responses To The Police Interrogation Were Not Voluntary..    4

    III. The State Appellate Court Unreasonably Applied Clearly Established Federal Law By Finding That Sufficient Evidence Supported Petitioner's Conviction..    6

    IV. The State Appellate Court Unreasonably Applied Clearly Established Federal Law By Admitting Evidence Of A Prior Sexual Offense And Unreliable Evidence Contained In The Tapes And Transcripts Of The Police Interrogations.    8

    V. The State Appellate Court Unreasonably Applied Clearly Established Federal Law By Rejecting Petitioner's Claim Of Prosecutorial Misconduct.    12

Conclusion    15

## TABLE OF AUTHORITIES

page

<u>United States Constitution</u>

Fifth Amendment                                                                 1

<u>Statutes</u>

California Penal Code section

220                                                                             6

<u>Cases</u>

*Alvarez v. Gomez,* 185 F.3d 995 (9th Cir. 1999)                           3
*Brecht v. Abrahamson*, 507 U.S. 619 (1993)                                     3,11,15
*Brewer v. Williams*, 430 U.S. 387 (1977)                                       4
*Darden v. Wainwright*, 477 U.S. 168 (1986)                                     12
*Donnelly v. DeChristoforo*, 416 U.S. 637 (1974)                                12
*Edwards v. Arizona*, 451 U.S. 477 (1981)                                       3
*Lynumn v. Illinois*, 372 U.S. 528, 534 (1963)                                  4
*McNeil v. Wisconsin,* 501 U.S. 171 (1991)                                      1
*Mincey v. Arizona*, 437 U.S. 385 (1978)                                        4,6
*Miranda v. Arizona*, 384 U.S. 436 (1966)                                       1,2
*Schneckloth v. Bustamonte,* 412 U.S. 218 (1973)                                4
*Withrow v. Williams*, 507 U.S. 680 (1993)                                      4

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF TRAVERSE

INTRODUCTION

Petitioner hereby incorporates the points, authorities and arguments of his Memorandum of Points and Authorities in Support of Petition for Writ of Habeas Corpus. Petitioner in this memorandum replies to specific arguments raised by respondent without waiving any arguments previously made.

I. THE STATE APPELLATE COURT UNREASONABLY APPLIED CLEARLY ESTABLISHED FEDERAL LAW BY REJECTING PETITIONER'S CLAIM OF *MIRANDA* ERROR.

Respondent argues that the petitioner made a valid waiver of his Fifth Amendment rights and argues that, prior to agreeing to talk with the police, petitioner did not invoke his right to counsel with sufficient clarity to compel the police to honor that right. Memorandum of Points and Authorities in Support of Answer [hereafter "Respondent's Memorandum] 7-9. Respondent overlooks petitioner's argument that the requirement that an invocation of the right to counsel be unambiguous applies only when the suspect has made a prior waiver of his Fifth Amendment rights as set forth in *Miranda v. Arizona* (1966) 384 U.S. 436. See Memorandum in Support of Petition, pp. 3-4. In addition, respondent is mistaken in the assertion that petitioner never made a sufficiently unambiguous invocation of the right to counsel. Memorandum in Support of Answer 7-9. In fact, he made more than one. As discussed in petitioner's Memorandum in Support of Petition, pp. 5-6, as soon as he was read the *Miranda* rights, petitioner said he thought he should have a lawyer. Ex. A, 1CT 111. This statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney in dealing with custodial interrogation by the police." *McNeil v. Wisconsin,* 501 U.S. 171, 178 (1991). Respondent relies on petitioner's further comment that he was trying to do God's will as casting doubt upon the statement "I think

Memorandum in Support of Traverse to Answer                Williams v. Horel, C 07-04269 TEH
p. 1

first, um, I should have a lawyer." But the police did not interpret the reference to God's will as rendering the first statement ambiguous, for Officer Aviles later asked, "Now you said, the first thing you said, you wanted a lawyer? Is that the first thing you said?" and petitioner responded "Right." 1CT113. Not only does that interchange reveal that Officer Aviles understood that petitioner had initially indicated that he wanted a lawyer, it also stands as another (and this time unquestionably unambiguous) expression of petitioner's desire for a lawyer. At this point, the police were undeniably compelled to cease questioning. (*Miranda v. Arizona*, *supra*, 384 U.S. at p. 474.)

Despite petitioner's unambiguous acknowledgement that the first thing he had said was that he wanted a lawyer, the police continued to ask questions. Respondent characterizes these as "appropriate clarifying questions," Memorandum in Support of Answer, p. 9, but they can only rationally be understood as attempts to change petitioner's mind. As noted in Petitioner's Memorandum in Support of Petition, the officers told petitioner that if he wanted a lawyer, the officers would walk out, 1CT113, implying that he would left alone there, handcuffed in that small room. Ex. A, 1RT 45. They also told him that he had to choose between talking with the officers and having a lawyer, 1CT113, which contradicted their earlier assurance, required by *Miranda*, that petitioner had the right to the presence of an attorney before and during questioning. 1CT111; *Miranda v. Arizona, supra,* 384 U.S. at pp. 479-480. The officers parried petitioner's repeated references to a lawyer by telling him that he could not have a lawyer just then, without reassuring him that a lawyer would be made available soon. They said "it's up to you. And then you can talk to us right now or not. (Inaudible), because right now, obviously there's not gonna be (inaudible)," prompting petitioner to say "(Inaudible) work on getting a lawyer, right?" to which Officer Bravo responded "Not right now." (1CT114.) When petitioner

Memorandum in Support of Traverse to Answer                    Williams v. Horel, C 07-04269 TEH

p. 2

suggested that he thought that it would be done later, Officer Bravo did not provide confirmation, but instead told petitioner that Bravo himself would not take the necessary steps to ensure that petitioner obtained a lawyer. (1CT114.) Petitioner's repeated efforts to obtain a lawyer were comparable to those of the petitioner in *Alvarez v. Gomez,* 185 F.3d 995 (9th Cir. 1999), which, "when considered together, constituted an unequivocal request for an attorney." *Id.*, p. 998. Here, as in *Alvarez*, the police sought to discourage the request for a lawyer by indicating that no lawyer would be provided anytime soon and by continuing to question petitioner. "[T]he police should have discontinued the interview at that point and not subjected [the suspect] to any further questioning until after he had had an opportunity to consult with a lawyer or until he, on his own initiative, resumed the conversation." *Alvarez*, *supra*, 185 F.3d at p. 998, citing *Edwards v. Arizona*, 451 U.S. 477 (1981). Because petitioner's subsequent waiver, upon which respondent relies, was "in response to further police initiated questioning," it is "without effect" and the statements "should have been suppressed." *Alvarez, supra*, 185 F.3d at p. 998. The state court's determination that petitioner waived his right to have counsel present at questioning is unreasonable.

    As respondent does not respond to petitioner's argument that the admission of the interrogations had a substantial and injurious effect or influence in determining the jury's verdict, it appears that respondent implicitly recognizes that the admission of those interrogations did have such effect. Thus, relief in habeas corpus is warranted. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).

Memorandum in Support of Traverse to Answer      Williams v. Horel, C 07-04269 TEH
p. 3

II.  THE STATE APPELLATE COURT UNREASONABLY DENIED RELIEF ON PETITIONER'S CLAIM THAT HIS RESPONSES TO THE POLICE INTERROGATION WERE NOT VOLUNTARY.

Although respondent acknowledges that "[w]hether a confession is voluntary must be judged by the totality of the circumstances," Respondent's Memorandum, p. 11, citing *Brewer v. Williams*, 430 U.S. 387, 402 (1977), respondent proceeds to examine each individual circumstance of the interrogations in isolation.  See Respondent's Memorandum, pp. 11-13.  Respondent describes the officers' focus on sexual activities and motivations as essential to the investigation, Respondent's Memorandum, p. 11, but fails to address the influence upon petitioner's methamphetamine-intoxicated and sleep-deprived mind of the officers' obsessive focus on sexual activity.  When respondent then addresses, in isolation, petitioner's methamphetamine intoxication, respondent describes it as "of no legal significance" in the absence of  "Supreme Court precedent establishing that [petitioner's] voluntary intoxication rendered police questioning inherently coercive."  Respondent's Memorandum, p. 12.  Respondent disregards Supreme Court precedent requiring the court to examine "all the surrounding circumstances--both the characteristics of the accused and the details of the interrogation" *Schneckloth v. Bustamonte,* 412 U.S. 218, 226 (1973), "to determine whether a confession had been 'made freely, voluntarily and without compulsion or inducement of any sort' [citation]" *Withrow v. Williams*, 507 U.S. 680, 689 (1993), and describing a statement as involuntary if it is not the product of  "a rational intellect and free will." *Mincey v. Arizona*, 437 U.S. 385, 398 (1978); *Lynumn v. Illinois*, 372 U.S. 528, 534 (1963).  Petitioner's comments were made in response to lengthy interrogations, conducted after the officers had rebuffed his attempts to get a lawyer, which focused obsessively on sex while petitioner, intoxicated by methamphetamine, was hallucinating about God and the CIA and a sealed chamber.  In view of

Memorandum in Support of Traverse to Answer                    Williams v. Horel, C 07-04269 TEH
p. 4

the circumstances in their totality, petitioner's comments were not the product of a rational intellect and free will, unaffected by the officer's psychological ploys.

Respondent denies that the officers played on petitioner's heightened religiosity and insists that the police, to the contrary, sought to distract petitioner from his theological ruminations. Respondent's Memorandum 12-13. Respondent disregards the statements by the police that sometimes people have to sacrifice themselves, 1CT 113, that God works in mysterious ways and never gives us more than we can carry, 1CT 114-115, and that God was in the room with the three of them, watching. 1CT 160. That ultimately the police told petitioner to "get off the God … thing" does not prove that they did not prior thereto exploit his intoxicated condition and religious feeling by making the comments just noted.

Respondent states that the interrogations were "very short," but that does not appear to be accurate. Respondent says that the first interview began shortly after 6:30 a.m., Respondent's Memorandum, 13, citing 5RT 899-900, which does not include that information, and that the second interview concluded between 9:00 and 9:30 a.m. Respondent's Memorandum 13, citing 5RT 969, 977. The officers' recollections at trial appear to have been mistaken, however, for in the transcript of the *first* interrogation petitioner notes that it is 10:00 a.m., and the officers do not correct him. 1CT117.

When the interrogations are viewed in the totality of their circumstances, they reveal that the police did indeed take advantage of petitioner's obviously impaired mental condition and brought intense pressure to bear upon his weakened will by denying his request for a lawyer, by obsessively insinuating into his mind thoughts of sex with children, by ignoring every response that showed a non-felonious intent, by insisting tirelessly that it is permissible not only to desire children but also to have sexual intercourse with children if they are willing, and by playing upon

Memorandum in Support of Traverse to Answer            Williams v. Horel, C 07-04269 TEH

p. 5

appellant's religious and patriotic sentiments.  Petitioner's responses were not the product of "a rational intellect and free will." *Mincey v. Arizona*, *supra*, 437 U.S. at p. 398 (1978).

### III. THE STATE APPELLATE COURT UNREASONABLY APPLIED CLEARLY ESTABLISHED FEDERAL LAW BY FINDING THAT SUFFICIENT EVIDENCE SUPPORTED PETITIONER'S CONVICTION.

Respondent says that "the evidence overwhelmingly showed that petitioner entered the Bauer residence with the intent to violate § 220," Respondent's Memorandum 15, and then identifies certain statements petitioner made during the police interrogations.  Respondent fails to note that petitioner's argument is that the interrogations do not constitute sufficient evidence because no rational factfinder could find petitioner's statements during those interrogations to be reliable.  The transcripts of the interrogations reveal that petitioner's thinking was gravely disordered and unreliable.  Consider, for example, the following interchanges:

"Moore:  You said it's a pussy thing.
"Williams:  That's right.
"Moore:  Right?  So that's what I'm just trying to understand.
"Williams:  I walk all around the neighborhoods right?
"Moore:  Um hum.
"Williams:  Just walking around, right?
"Moore:  Uh hum.
"Williams:  There's a whole bunch of things that are going on.  Uh, the whole concept of God the surveillance system everything.  The comprehension that's going on my head …
"Moore:  Uh hum.
"Williams:  … alright, the CIA that's following me, uh, immunity, um, the fact that I can walk by a thousand, ten thousand houses and never help one person in a window …
"Moore:  Uh hum.
"Williams:  … perfect consistent patterns on each house that leads to the, the choice of crossing a border (Inaudible)."  (1CT 188-189.)

"Pierce:  Like you said earlier that, it's a pussy thing and you're on crank today and you go in your neighbor's house.  What were you going over there for?
"Williams:  To, well it's kind of a two fold thing.  It's like, uh, I'm gonna push button and find a piece of this puzzle …
"Moore:  Uh hum.
"Williams:  … find the piece that's there and, hell, you never know, might get lucky.
"Moore:  With a piece of what's there?
"Williams:  The, uh, movement of people.

Memorandum in Support of Traverse to Answer                    Williams v. Horel, C 07-04269 TEH
p. 6

"Moore: What were you looking for? What were you wishing for?
"Williams: What do you mean?
"Pierce: What would make your perfect ….
"Williams: I actually do think I'm perfect.
"Moore: What was that?
"Williams: A whole fucking thing fell together and, it was like, uh, holding (Inaudible).
"Pierce: Okay, you were over there. Were you over there hoping to get some pussy?
"Williams: That's not what I went over there for, but, of course …
"Pierce: Well what did you go over there for?
"Williams: Hoping to pull a piece of the puzzle out.
"Moore: What piece of the puzzle you pull out?
"Williams: See if I was after pussy, I could have gone over to other friends." (1CT192-193.)

"Moore: Yeah, so, pussy thing and the movement of the people fucking piece of the puzzle shit, we really don't get cuz you don't have the benefit (Inaudible) alright, but we know what pussy thing means. We know that Terry most likely has a pussy so that's why my partner keeps going back to it."
"Williams: What if this things real or isn't real or what, what, what. (Inaudible)."
"Pierce: Let me ask you Greg. What would, if Terry's [sic]wouldn't have came out when he did, what would have happened?
"Williams: I don't know.
"Pierce: What do you think would have happened? You think you would have had sex with Terry?
"Williams: There's several, uh, hypothetical scenarios. (Inaudible).
"Pierce: Give us it, give us a couple. You think you would have had sex with Terry?
"Williams: At what point? Where what?
"Pierce: If her husband was not home, he did not come out when he did and call the police, what would have happened?
"Williams: Well that makes no sense because there wasn't anybody there.
"Pierce: So why were you hiding under the house?
"Williams: I was trying to get access to a new environment." (1CT196-197.)

Stating it in a more coherent fashion than petitioner did, petitioner claimed to have gone next door to find a piece of the puzzle, having to do with the movement of people, which indicated a sex ring in which the CIA was involved, which was tied up with the concept of God and the whole surveillance system, which somehow prevented him from having any success with women, and to have believed that if he went over to the Bauers' house he might obtain some information having to do with DNA which would explain why he is so unsuccessful with women. (1CT186-189, 191-192, 198-199.) Respondent focuses on petitioner's statement that

Memorandum in Support of Traverse to Answer                    Williams v. Horel, C 07-04269 TEH
p. 7

"it's a pussy thing," Respondent's Memorandum 15, although petitioner's ravings might be better understood as indicating that petitioner believed that if his investigations at the Bauers' house were fruitful, he would resolve the mystery and would then be successful with women again, and in that sense it was "a pussy thing." But no rational jury could interpret petitioner's ravings as reliably revealing his intent.

Once petitioner's unreliable ravings are put aside, the remaining evidence is plainly insufficient to prove an intent to commit a sexual assault. See Memorandum in Support of Petition, 15-16. The appellate court's decision was an unreasonable application of federal law.

IV. THE STATE APPELLATE COURT UNREASONABLY APPLIED CLEARLY ESTABLISHED FEDERAL LAW BY ADMITTING EVIDENCE OF A PRIOR SEXUAL OFFENSE AND UNRELIABLE EVIDENCE CONTAINED IN THE TAPES AND TRANSCRIPTS OF THE POLICE INTERROGATIONS.

With respect to the argument that the court improperly admitted evidence of a prior conviction of a sexual offense and other possible prior sexual offenses alluded to in the interrogations, respondent says that "evidence of prior bad acts does not violate due process where it is admitted to prove a specific issue in dispute" and notes the appellate court's finding that the statements regarding prior sexual offenses were admitted to prove petitioner's state of mind. Respondent's Memorandum 16. Petitioner's state of mind – his intent – was the crucial issue in this case, but neither the 1993 conviction of annoying or molesting a child, 6RT 1014, nor the vague and confusing statements petitioner made during the police interrogations about getting too close to children in the past illuminate petitioner's motivation in entering the Bauers' house. Nothing in the burglary itself suggested an intent to commit a sexual assault. As noted in the Memorandum in Support of the Petition, law enforcement could have hypothesized that petitioner intended to commit larceny in the Bauer home, despite the lack of any evidence that

Memorandum in Support of Traverse to Answer                 Williams v. Horel, C 07-04269 TEH
p. 8

petitioner tried to take anything, questioned him persistently about his interest in money and goods, obtained acknowledgements about how nice it is to possess money and goods, and adduced petitioner's prior theft crime in an attempt to prove the intent to commit a theft offense. The police conjured an intent to commit a sexual assault out of thin air and the court then used that supposed intent to authorize the admission of evidence of prior sex crimes.

Respondent notes the trial court's instruction to the jury that it should not consider petitioner's criminal history or possible prior custodial status other than the prior conviction of annoying or molesting a child. Respondent's Memorandum 16, citing RT 1057. The court's instruction was in regard to a specific discussion in the transcripts of the police interrogation, which the court had intended but neglected to redact, relating to petitioner's "rap sheet." Given the context of the instruction, the jury would not have understood the instruction as relating to other parts of the transcripts, even though petitioner made confusing statements about prior sexual conduct at various points during the interrogations.

Indeed, it is clear that the trial judge considered petitioner's comments about other possible sexual offenses to be relevant to the question of petitioner's intent in entering his neighbors' house. The court's reason for admitting those statements was their supposed probative value on the issue of intent. Thus with respect to the admission of statements relating to petitioner's ex-wife's 16-year-old daughter, the court explained "It may assist the jury in their inference on the determination what intent, if any, the defendant entered." See Ex. F at 21. If the trial court intended the jury to disregard all discussions of possible prior sexual offenses with respect to petitioner's intent, it would have excluded those portions of the transcripts, as they could serve no other purpose. The jury surely understood that all that evidence was admitted to be considered, rather than simply disregarded.

Memorandum in Support of Traverse to Answer            Williams v. Horel, C 07-04269 TEH

p. 9

What is more, the trial court instructed the jury that "Evidence has been introduced for the purpose of showing that the defendant engaged in the sexual offense *on one or more occasions* other than that charged in this case." Augmentation of Record on Appeal, 3/12/04, p. 10. Italics added. The court went on to note that sexual offense means any conduct made criminal by section 647.6, which the court defined as conduct directed at a child under the age of 18 years which would disturb or irritate a normal person and was motivated by an unnatural or abnormal sexual interest in the victim. *Id.*, p. 11. That being a very broad category, any of petitioner's confusing comments about partying and getting close to girls in the past might have been understood by the jury as falling within that description. The court authorized the jury to infer from a prior sexual offense that petitioner had a disposition to and did commit the charged offense. *Id.*, pp. 10-11. The prosecutor, in summation, advised the jury to review the transcripts looking for evidence of petitioner's intent. *Id.*, p. 47. The prosecutor noted Officer Bravo's comment

> So you would go out or got out, and you went and did more, more of what got you arrested in the first place. And he says yep. For a reason. What's that? I've been running around trying to get laid for years. He knew what he was doing, why he was doing it, knew the effects of what he was doing. This was about a sexual assault. *Id.*, p. 52.

(It is likely that petitioner understood Bravo to be speaking of petitioner's use of methamphetamine, for which he had been arrested the day before the incident, see 1CT132, but the jury would likely have understood it, especially in the prosecutor's retelling, as an admission that, after getting out of jail for a sexual offense, petitioner committed more sexual offenses.) The prosecutor told the jury that such conduct implied that this incident "was about a sexual assault." *Id*. The prosecutor asked the jury to read the entire transcripts, explaining "[t]hese assist because he tells you why he's there." *Id.*, p. 56. It is inconceivable that the jury did not attend to

Memorandum in Support of Traverse to Answer               Williams v. Horel, C 07-04269 TEH
p. 10

the discussions of possible prior sexual offenses for the bearing they might have on petitioner's disposition or intent, as there is no other issue upon which they could have any possible bearing and no other reason for their admission into evidence at all.  Indeed, the Court of Appeal found no error in the admission of petitioner's comments about prior sexual inclinations and conduct because it found them to be relevant to petitioner's intent. Ex. F at 24, 26.  The Court of Appeal decided that "[a]ppellant's statements were *all* made in the context of an exploration of his state of mind at the time he entered the Bauer home …" Exh. F at 26.  It is not disingenuous to conclude that the jury did use the confusing statements about prior conduct with children in discerning petitioner's intent, as such use is precisely what those portions of the interrogations were admitted for, and the limiting instruction to which respondent adverts was itself limited to a particular portion of the transcripts where petitioner's rap sheet is discussed.

     Respondent denies any harm, arguing that petitioner made other statements that "overwhelmingly" show that petitioner intended to commit a sexual assault.  Respondent's Memorandum 20.  Other than the perhaps joking answer "Ahh, looking for girls," to the question why he went next door, the responses cited by respondent occurred after the police had expended considerable effort leading petitioner's thoughts towards prohibited sex and, for the most part, occurred late in the interrogations, when petitioner's thoughts were manifestly more and more disordered. The evidence apart from the evidence of prior possible sexual misconduct was far from overwhelming, and the erroneous admission of the evidence of prior possible sexual misconduct had a substantial and injurious effect or influence in determining the jury's verdict, warranting relief. *Brecht v. Abrahamson*, *supra*, 507 U.S. at p. 637.

Memorandum in Support of Traverse to Answer            Williams v. Horel, C 07-04269 TEH
p. 11

## V. THE STATE APPELLATE COURT UNREASONABLY APPLIED CLEARLY ESTABLISHED FEDERAL LAW BY REJECTING PETITIONER'S CLAIM OF PROSECUTORIAL MISCONDUCT.

The prosecutor committed misconduct which infected the trial with unfairness so as to make the conviction a denial of due process, warranting relief. *Darden v. Wainwright*, 477 U.S. 168, 181 (1986), *Donnelly v. DeChristoforo*, 416 U.S. 637, 639-645 (1974).

Petitioner complained, among other things, of the prosecutor's comments about petitioner's view of sex with a 15-year-old. Respondent argues that petitioner's claim fails because, in respondent's view, "petitioner's interrogation supported the prosecutor's argument. He specifically stated that he would consider having sex with a 15-year-old girl." Respondent's Memorandum 21. The portion of the interrogation at issue went as follows:

"Aviles: You had your, in your life, everyone's different. We're all different We all have different tastes. Some guys like young looking girls. Some guys like young girls. Other guys like older girls. Some guys really like old ladies. Some guys like fat chicks. Some guys like skinny chicks. Okay? Right? You tend to like young girls when you're on crank. Not when you're normal. When you're on crank.
"Williams: Yeah.
"Aviles: It seems like you like the girls. Okay?
"Williams: Yeah, you're right. The younger, the better, provided they're old enough.
"Aviles: Listen. Provided they're willing, and that you're not going to force them, (inaudible). Okay?
"Williams: And, and that girl, that girl is first (inaudible).
"Aviles: (Inaudible).
"Williams: If I feel it's a situation where it's not good for a girl. Then I'm not going there.
"Aviles: So, your, your age limit with girls I would say,…
"Williams: No more. The kids were more important than me.
"Aviles: Correct. I understand that. But you do tend to like young girls when you're on crank.
"Williams: All right. Yes, it's true.
"Aviles: Am I right? Okay. The age that I'm getting from you, talking with you, learning a little bit about you, seems to be around about ten to twelve year old [sic] age. But the girls know right from wrong. When they can say yes or no. Okay? Isn't that correct? If I'm wrong, tell me I'm wrong.
"Williams: Um, no, I don't, I don't, I, I eh. You know what? I can't even fathom a ten or twelve year old girl being able to have sex…
"Aviles: Okay. How…

Memorandum in Support of Traverse to Answer                Williams v. Horel, C 07-04269 TEH
p. 12

"Williams: without getting hurt.
"Aviles: How 'bout a 15 year old?
"Williams: Well that (inaudible). I know a 15 year old.
"Aviles: Correct. (Inaudible). But a 15 year old that's mature, her body's mature, that's no problem if she's willing. 'Cause you're not forcing her.
"Williams: She [sic] wanted to take away the psychological issues and …
"Aviles: Correct.
"Williams: the ahh, the diseases.
"Aviles: Correct. Take that away.
"Williams: (Inaudible).
"Aviles: Just…
"Williams: Take that away. Just, I mean,…
"Aviles: normal sex.
"Williams: nothing else.
"Aviles: Just normal sex.
"Williams: Well, yeah.
"Aviles: There's no problem with that. Now, today, when you broke into the house, and I [sic] broke in, because when I, when I mean, broke in, please don't get me wrong. I mean, that you were not invited in. Okay? When you broke into that house, you went to that house, there was a young girl, there's Terry [Mrs. Bauer] there. Which girl, knowing that you're on crank today, which girl did you go there to see?
"Williams: I didn't really go there to go see anybody specifically. I ain't ahh, I went there specifically to figure out where they were staying and rattle the cage, because um, all right.
"Bravo: But you were horny.
"Williams: God, you need to fucking get in here.
"Aviles: He's in here. He's watching (inaudible)… 1CT157-160.

The prosecutor suggested to the jury that petitioner approved of sex with a fifteen year old (Aug. RT 57) and said "[h]e tells you that he's not averse to sex with minors. (*Id*.) Petitioner's comments do not admit of that interpretation. The prosecutor also told the jury that petitioner said that under the influence of methamphetamine he likes girls, "the younger the better." Petitioner actually said "the younger, the better, *provided they're old enough*." 1CT 54. Emphasis added. The interrogation does not support the prosecutor's statements.

The prosecutor used petitioner's comment that the daughter is not as good looking as her mother as evidence that petitioner was thinking sexually about the daughter, saying, "This is a child. Not as good looking as her mom? He's describing a child in that fashion?" Aug. RT 49. Petitioner's comment, however, was in response to the officer's question "She as good looking

as her mom?" 1CT 119.  Here and in numerous other instances, see Petitioner's Memorandum in Support of Petition 27-31, the prosecutor misrepresented the interrogations.   Among these other instances was the assurance to the jury that the officers (and specifically Detective Pierce) saw petitioner as lucid and manipulative.  Among other things, the prosecutor said "Detective Pierce: Lucid, aware, knew what he was doing.  We were focusing him back because we didn't believe he was being forthright with us.  He was playing games."  Aug. RT 132.  The prosecutor was plainly adverting to Officer Pierce's testimony that, in his opinion, appellant "knows what he's doing" and was "just trying to control the situation, control the interview to go the way he wanted it to go."  6RT 1008.  The court had ruled that this testimony and "the officer's opinions of the defendant's veracity, responsiveness and mental state" could be used only to the extent it helped the jury to understand the officer's actions.  6RT 1032-1033.  Contrary to respondent's assertion, Respondent's Memorandum 21, the court's admonition was not expressly limited to Pierce's trial testimony, and both the instruction and its rationale applied with equal force to the opinions about petitioner's mental state the officers expressed during the interrogations.  Even if the admonition were so limited, the prosecution's comment violated the limitation, for it plainly paraphrased Pierce's testimony.

It may be rare for a prosecutor's misconduct to infect a trial with unfairness warranting federal habeas relief.  This is a rare case. After discouraging the invocation of the right to counsel at the interrogations, the police persistently directed the intoxicated suspect's delusional thinking towards the subject of sex with children and then, because his responses remained insufficiently probative of an intent to commit a sex crime, the prosecutor distorted those responses to make them appear more probative, and, in order to quell any jurors' concerns about the reliability of petitioner's delusional statements, violated the court's limiting instruction by

Memorandum in Support of Traverse to Answer                    Williams v. Horel, C 07-04269 TEH

assuring the jury that the officers had determined that petitioner was lucid and in control. This is gross unfairness in violation of petitioner's due process rights.

Respondent denies that the prosecutor's challenged conduct had a substantial and injurious effect or influence in determining the jury's verdict. Respondent's Memorandum 21. Petitioner's intent in entering his neighbors' home was the critical issue in the case. The prosecutor's misrepresentations led the jury to believe, falsely, that petitioner had admitted (or, as the prosecutor said at one point, come close to admitting) that his intent in entering that home was to sexually assault the young girl. The effect could not have been other than substantial and injurious, and relief is warranted. *Brecht v. Abrahamson, supra*, 507 U.S. at p. 637 (1993).

## CONCLUSION

For the reasons stated above and in Petitioner's Memorandum in Support of Petition, petitioner respectfully requests that the Petition for Writ of Habeas Corpus be granted.

November 12, 2007                                           Respectfully submitted,


                                                            /s/ Maureen L. Fox
                                                            Attorney for Petitioner
                                                            Gregory Williams