1

2

3

4                              IN THE UNITED STATES DISTRICT COURT

5                          FOR THE NORTHERN DISTRICT OF CALIFORNIA

6

7

8    GREGORY WILLIAMS,

9                            Petitioner,          NO. C07-4269 TEH

10                  v.                             ORDER DENYING PETITION
                                                  FOR WRIT OF HABEAS
11   ROBERT HOREL,                                CORPUS

12                            Respondent.

13

14         Petitioner Gregory Williams is currently incarcerated by the California Department of

15   Corrections and Rehabilitation at Pelican Bay State Prison in Crescent City, California.

16   Petitioner filed a petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, before

17   this Court on August 20, 2007.  After conducting an initial review of the petition, the Court

18   ordered Respondent Robert Horel to show cause as to why the petition should not be granted.

19   Respondent filed an answer on October 19, 2007, and Petitioner filed a traverse on

20   November 12, 2007.  After carefully reviewing the parties' written arguments, the record,

21   and governing law, the Court now DENIES Petitioner's request for a writ of habeas corpus

22   for the reasons set forth below.

23

24   **I.    BACKGROUND**

25         Petitioner does not dispute the underlying facts of this case.  Petitioner lived with his

26   mother and a friend in the Willow Glen neighborhood of San Jose, next door to the Bauers, a

27   couple with two children.  Early in the morning on October 24, 2002, Mrs. Bauer heard

28   footsteps on the roof of their house, which was under construction.  Mrs. Bauer awakened

*United States District Court*
*For the Northern District of California*

**United States District Court**
For the Northern District of California

1  her husband, who, upon investigating, heard a radio that the construction workers had left on

2  the roof and what sounded like a person running and jumping off of the roof.  Mr. Bauer

3  advised his wife to call the police.  When the police arrived, they searched the house for

4  several minutes before concluding that the intruder had left.  All officers left the scene,

5  except for one officer who remained to speak with a neighbor across the street.

6      Mrs. Bauer then went to check on her children in their bedroom.  While walking

7  towards the bedroom, she saw someone enter the hallway.  Mrs. Bauer ran to her children's

8  bedroom and placed a chair under the door handle.  She then instructed her daughter to open

9  the window and call for Mr. Bauer.  Both Mr. Bauer and the remaining police officer heard

10  the child's scream and returned to the house, where Petitioner was located in the master

11  bedroom, lying on the bed with his hands behind his head.  The officer then arrested

12  Petitioner and took him into custody.

13      Four officers working in pairs interrogated Petitioner consecutively.  Richard Bravo, a

14  San Jose police officer, testified at trial that he believed Petitioner to be under the influence

15  of methamphetamine, which can cause delusional thinking and erratic speech patterns.

16  Bravo testified that he sought to obtain information from Petitioner about his specific intent

17  in entering the Bauers' residence.  Petitioner had been convicted of misdemeanor child

18  molestation ten years prior, and Bravo's interview focused on the possibility that Petitioner

19  intended to commit a sexual offense against either Mrs. Bauer or her ten-year-old daughter.

20  At trial, the tapes and transcripts of the police interviews with Petitioner, as well as

21  Petitioner's prior conviction for a misdemeanor sexual offense, were admitted into evidence

22  over Petitioner's objections.

23      On March 15, 2004, a jury in the Superior Court of Santa Clara County convicted

24  Petitioner of one felony count of first degree burglary, Cal. Penal Code §§ 459-60, and one

25  misdemeanor count of being under the influence of methamphetamine, Cal. Health & Safety

26  Code § 1150(a).  In a separate proceeding the following day, the trial court found two prior

27  strike allegations to be true.  On November 22, 2004, the court sentenced Petitioner to a state

28  prison term of twenty-five years to life.

United States District Court

For the Northern District of California

1    On December 6, 2004, Petitioner filed a notice of appeal in the California Court of

2    Appeal, Sixth District.  On June 29, 2006, the Court of Appeal affirmed the conviction in an

3    unpublished opinion.  On August 1, 2006, Petitioner filed a petition for review in the

4    California Supreme Court, which denied review on October 11, 2006.  The grounds raised in

5    the petition filed before this Court are the same as those raised in Petitioner's direct appeal.

6

7    **II.    EXHAUSTION**

8    Prisoners in state custody who wish to challenge their confinement in federal habeas

9    proceedings must first exhaust state judicial remedies, either on direct appeal or through

10   collateral proceedings, by presenting the highest state court available with a fair opportunity

11   to rule on the merits of their claims.  *See* 28 U.S.C. § 2254(b), (c).  The parties do not dispute

12   that Petitioner has exhausted state remedies as to all of the claims presented in this petition.

13

14   **III.   STANDARD OF REVIEW**

15   Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), this

16   Court cannot grant a writ of habeas corpus with respect to any claim that was adjudicated on

17   the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a

18   decision that was contrary to, or involved an unreasonable application of, clearly established

19   Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a

20   decision that was based on an unreasonable determination of the facts in light of the evidence

21   presented in the State court proceeding."  28 U.S.C § 2254(d).  The Court must presume the

22   correctness of the state court's factual findings, and the petitioner bears the burden of

23   rebutting that presumption by clear and convincing evidence.  28 U.S.C § 2254(e)(1).

24   A state court's decision is "contrary to" clearly established United States Supreme

25   Court law if it fails to apply the correct controlling authority, or if it applies the controlling

26   authority to a case involving materially indistinguishable facts but reaches a different result.

27   *Williams v. Taylor*, 529 U.S. 362, 413-14 (2000).  A decision is an "unreasonable

28   application" of United States Supreme Court law if "the state court identifies the correct

3

1 governing legal principle . . . but unreasonably applies that principle to the facts of the

2 prisoner's case." *Id.* at 414.

3   "[A] federal habeas court may not issue the writ simply because that court concludes

4 in its independent judgment that the relevant state-court decision applied clearly established

5 federal law erroneously or incorrectly.  Rather, that application must be objectively

6 unreasonable." *Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003) (citation and internal

7 quotations omitted).  "While the 'objectively unreasonable' standard is not self-explanatory,

8 at a minimum it denotes a great[] degree of deference to the state courts."  *Clark v. Murphy*,

9 331 F.3d 1062, 1068 (9th Cir. 2003).

10   Holdings of the Supreme Court at the time of the state court decision are the only

11 definitive source of clearly established federal law under AEDPA. *Williams*, 529 U.S. at

12 412.  "While circuit law may be 'persuasive authority' for purposes of determining whether a

13 state court decision is an unreasonable application of Supreme Court law, only the Supreme

14 Court's holdings are binding on the state courts and only those holdings need be reasonably

15 applied." *Clark*, 331 F.3d at 1070 (citation omitted).

16   Even if a petitioner meets the requirements of § 2254(d), habeas relief is warranted

17 only if the constitutional error at issue had a substantial and injurious effect or influence in

18 determining the jury's verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993).  Under this

19 standard, petitioners "are not entitled to habeas relief based on trial error unless they can

20 establish that it resulted in 'actual prejudice.'" *Id.* (citing *United States v. Lane*, 474 U.S.

21 438, 439 (1986)).

22

23 **IV.  DISCUSSION**

24   **A.  Claim 1: Invocation of *Miranda* Rights**

25   In his first claim, Petitioner asserts that the police interrogations following his arrest

26 violated his Fifth and Fourteenth Amendment rights as set forth in *Miranda v. Arizona*, 384

27 U.S. 436 (1966).  He further contends that the trial court erroneously denied Petitioner's

28 motion to suppress the tapes and transcripts of the interrogation.

4

*United States District Court*
For the Northern District of California

United States District Court

For the Northern District of California

1    Officer Richard Bravo and Sergeant Frank Aviles began interrogating Petitioner at

2  6:30 AM on the morning of his arrest.  Resp. Ex. F at 5 (*People v. Williams*, No. H028263,

3  2006 Cal. App. Unpub. LEXIS 5713 (June 29, 2006)).  The officers had the following

4  exchange with Petitioner, as documented in the police interview tapes and transcripts that

5  were entered into evidence at trial:

6        Bravo: My name is Detective Bravo.  This is Sergeant Aviles.
         Okay.  But, so, we're talking about ah, what happened out there
7        this morning.  How do you feel about that?  Do you want to talk
         to us this morning?  You sure?  Okay.  Just so we're all clear and
8        everything, what I'm gonna do is read you your rights.  Okay.  So
         there's no misunderstanding between us.  You have the right to
9        remain silent.  Do you understand?

10       Williams: Yes.

11       Bravo: Anything you say may be used against you in court.  Do
         you understand?
12
         Williams: I do.
13
         Bravo: You have the right to the presence of an attorney before
14       and during any questioning.  Do you understand?

15       Williams: Yes.

16       Bravo: If you cannot afford an attorney, one will be appointed to
         you free of charge before any questioning if you want.  Do you
17       understand that?

18       Williams: Yeah.

19       Bravo: And having all that in mind, basically what I want to do is
         just find out from you what was going on this morning.  Sounds
20       like there was a lot of running around, some yelling and
         screaming, and I just want to know why you were in that house.
21
         Williams: *Ah, well, I think first, um, I should have a lawyer.  And*
22       *ah, second, I'm trying to figure out.  Well, trying to do God's*
         *will.*
23
         Bravo: Trying to do God's will.
24
         Aviles: What do you mean by that?  You have me thrown
25       (inaudible) that one.

26       . . . .

27       Aviles: *Yeah.  Now you said, the first thing you said, you wanted*
         *a lawyer?  Is that the first thing you said?*
28

5

**United States District Court**
For the Northern District of California

1    <u>Williams</u>: *Right.  Well, it was, because . . . .*

2    <u>Aviles</u>: *Help, help us.*

3    <u>Williams</u>: *I (inaudible), because . . . .*

4    <u>Aviles</u>: *I just want to understand.  But if you want a lawyer, we'll walk out of this room.  You can't talk to me if you want a lawyer.*

5    <u>Williams</u>: *Oh.*

6

7    <u>Aviles</u>: *I just want to understand that, that's a statement you made.  You want a lawyer. . . .*

8    <u>Williams</u>: *(Inaudible).*

9    <u>Aviles</u>: *or do you want to talk  to us?*

10   <u>Williams</u>: *I want, hell, I'll just talk to you then.*

11   <u>Aviles</u>: Okay.  Well, I won't change your mind, no.  That . . . .

12   <u>Williams</u>: Yeah.  No, I'm, no, I'm not trying to . . . .

13   <u>Aviles</u>: You understand?  Okay.

14   <u>Williams</u>: I, I mean, you read the, read . . . .

15   <u>Aviles</u>: Ah, we read . . . .

16   <u>Williams</u>: the card, . . .

17   <u>Aviles</u>: you your rights.

18   <u>Williams</u>: cards . . . .

19   <u>Bravo</u>: Right.

20   <u>Williams</u>: said . . . .

21   <u>Aviles</u>: Did, did . . . .

22   <u>Williams</u>: that you can have a lawyer.

23   <u>Aviles</u>: Yeah, and, and . . . .

24   <u>Williams</u>: *It's an intelligent thing to do, isn't it?*

25   <u>Aviles</u>: Yeah, it is.  Yeah.  So if you want a lawyer . . . .

26   <u>Bravo</u>: But we're looking for clarification.  Because you said you did want to talk to us.  But then you said, well, I think I should

27   have a lawyer.  So, it's up to you.  And then you can talk to us right now or not. (Inaudible), because right now, obviously,

28   there's not gonna be (inaudible).

6

United States District Court

For the Northern District of California

1

2          Williams: (Inaudible) work on getting a lawyer, right?

3          Bravo: Not right now.

          Williams: Oh.  Well, yeah, I think that later.

4
          Bravo: Will I personally do it?  No.

5
          Aviles: You know how the system works, right?  Right?

6
          Williams: I'll, I'll, I'll . . . .

7
          Bravo: Do you want, do you want to talk to us?  Gregg [sic].

8
          Aviles: You sure you want to talk to us?

9
                    Williams: Yeah.

10
          Aviles: Okay.  Maybe one (inaudible)-

11
          Williams: *I don't even need a lawyer though.  I'll just let God*
12          *handle it.*  (Italics added.)

13   Resp. Ex. F at 5-9 (emphases in original).  Following this exchange with Bravo and Aviles,

14   Petitioner proceeded to speak with the officers.

15          Petitioner subsequently filed a motion before trial to suppress his statements to the

16   police on grounds that they were obtained in violation of his *Miranda* rights.  The trial court

17   denied Petitioner's motion, and the appellate court affirmed.

18          In *Edwards v. Arizona*, 451 U.S. 477, 484 (1981), the Supreme Court held that when a

19   suspect requests counsel at any time during a custodial interrogation, he cannot be subjected

20   to further questioning unless a lawyer has been made available or the suspect reinitiates

21   conversation.  To invoke the "prophylactic rule" established in *Edwards*, however, a court

22   must first "determine whether the accused *actually invoked* his right to counsel."  *Smith v.*

23   *Illinois*, 469 U.S. 91, 95 (1984) (emphasis added).  To meet that standard, "the suspect must

24   unambiguously request counsel"; that is, he or she "must articulate his desire to have counsel

25   present sufficiently clearly that a reasonable police officer in the circumstances would

26   understand the statement to be a request for an attorney."  *Davis v. United States*, 512 U.S.

27   452, 459 (1994).  "If the statement fails to meet the requisite level of clarity, *Edwards* does

28   not require that the officers stop questioning the suspect."  *Id.*

**United States District Court**
For the Northern District of California

1    The state appellate court did not unreasonably apply the above clearly established law,

2  nor was its decision contrary to such law. Petitioner's initial statement – "I think . . . I should

3  have a lawyer," Resp. Ex. F at 6 – was ambiguous and equivocal, and Aviles and Bravo were

4  not required to cease questioning at that time. *See Davis*, 512 U.S. at 462 (holding that

5  saying "[m]aybe I should talk to a lawyer" was not an unambiguous request for counsel).

6  When the officers attempted to clarify if Petitioner was invoking his right to counsel,

7  Petitioner said, "I want, hell, I'll just talk to you then." Resp. Ex. F at 7. When the officers

8  inquired further as to Petitioner's intent, he provided a number of confusing and disjointed

9  responses. Ultimately, Petitioner told the officers, "I don't even need a lawyer though. I'll

10  just let God handle it." *Id.* at 9. Given Petitioner's statements, the state court's conclusion

11  that Petitioner did not make a clear request for counsel was a reasonable determination of

12  facts and application of law. While Petitioner *might* have been requesting counsel with his

13  first statement, that is insufficient to invoke his right to counsel under clearly established

14  Supreme Court precedent. *See, e.g., Davis*, 512 U.S. at 462 (explaining that the Supreme

15  Court was "unwilling to create a third layer of prophylaxis to prevent police questioning

16  when the suspect *might* want a lawyer").

17    Petitioner attempts to distinguish *Davis* on grounds that the suspect in that case had

18  already waived his right to counsel before issuing his ambiguous statement regarding an

19  attorney. However, the fact that Petitioner did not waive his right to counsel prior to making

20  the statements at issue does not alter the Court's threshold inquiry as to whether Petitioner's

21  request for counsel met "the requisite level of clarity." *Id.* at 459.

22    Petitioner also seeks to rely on *Alvarez v. Gomez*, 185 F.3d 995 (9th Cir. 1999), to

23  demonstrate that the state court's decision was an unreasonable application of law. *Alvarez*,

24  however, is distinguishable from Petitioner's case. First, Alvarez filed his habeas petition

25  prior to the enactment of AEDPA, and the Ninth Circuit reviewed his claim *de novo*. *Id.* at

26  997. After AEDPA, this Court may only reverse the state appellate court's findings if its

27  application of clearly established federal law was "objectively unreasonable." *Andrade*, 538

28  U.S. at 75-76. In addition, when the investigating officers informed Alvarez of his *Miranda*

8

United States District Court

For the Northern District of California

1   rights and inquired if he wished to invoke those rights, Alvarez stated, "Can I get an attorney

2   right now, man?" followed by, "You can have attorney right now?" and "Well, like right now

3   you got one?" *Alvarez*, 185 F.3d at 996-97.  Petitioner's single ambiguous response is not

4   the equivalent of the cumulative effect of Alvarez's three questions.  Moreover, *Alvarez* is

5   merely persuasive authority while the Supreme Court's holding in *Davis* was binding on the

6   state court.  *See Williams*, 529 U.S. 362, 412 (2000); *see also Clark*, 331 F.3d at 1070

7   (explaining that "our own precedent is not much help since it is somewhat inconsistent on

8   what constitutes an equivocal request for a lawyer").  For all of these reasons, the Court finds

9   Petitioner's reliance on *Alvarez* to be unpersuasive.

10         In short, for the reasons discussed above, the appellate court's affirmation of the trial

11   court's decision to deny Petitioner's motion to suppress pursuant to a *Miranda* violation was

12   not contrary to, or an unreasonable application of, clearly established Supreme Court law.

13   Accordingly, the Court DENIES Petitioner's *Miranda* claim.

14

15         **B.      Claim 2: Voluntariness of Petitioner's Statements to Police**

16         Petitioner asserts in his second claim that his statements to police during the

17   interrogation were involuntary, and that the trial court's denial of his motion to suppress the

18   transcripts and recordings of the interrogation therefore violated his due process rights under

19   the Fifth and Fourteenth Amendments.  The Court of Appeal denied this claim on the merits.

20   Resp. Ex. F at 14-17.

21         Following Petitioner's arrest, four police officers working in pairs interrogated

22   Petitioner consecutively at the San Jose Police Department, and Officer Bravo estimated that

23   each pair of officers interviewed Petitioner for approximately one hour each, for a total of

24   two hours.  Resp. Ex. B., Vol. V at 977 (Reporter's Tr.).  The interview room was

25   approximately twelve feet by twelve feet and contained a metal table and two stools.  Resp.

26   Ex. F at 14.  Police used a "surreptitious microphone" to record the interrogation, but

27   Petitioner appeared aware that the interview was being recorded, as he asked at one point

28   during the interview, "You've been recording the conversation, right?"  *Id.* at 14 & n.4.

United States District Court

For the Northern District of California

1  Petitioner testified that, at the time of the interview, he had not slept for approximately

2  twenty-four hours and was suffering the effects of methamphetamine consumption. *Id.* at 14.

3  Petitioner also testified that, in the years preceding his arrest at the Bauers' home, he had

4  been read his *Miranda* rights, and that he had understood those warnings, "around 30 times."

5  *Id.* at 15.  During the questioning, officers asked multiple questions of a sexual nature – e.g.,

6  "you weren't there to rape the little boy?" and "You tend to like young girls when you're on

7  crank," Resp. Ex. A at 128, 157 (Clerk's Tr. on Appeal) – but these questions followed

8  Petitioner's answer to one of the officers' first questions of why Petitioner went next door to

9  the Bauers': "Ahh, looking for girls," *id.* at 117.  As he argued on appeal, Petitioner now

10  contends that the failure of the police to grant his request for an attorney, his weakened

11  mental state due to methamphetamine consumption and sleep deprivation, and the coercive

12  nature of the officers' repeated sexual insinuations rendered his statements involuntary and

13  therefore inadmissible.

14       Before a criminal defendant's statement can be admitted into evidence, due process

15  requires the government to prove by a preponderance of the evidence that the statement was

16  voluntary. *Colorado v. Connelly*, 479 U.S. 157, 168-69 (1986).  A defendant's statement is

17  voluntary if it is "the product of a rational intellect and a free will." *Blackburn v. Alabama*,

18  361 U.S. 199, 209 (1960).  The Supreme Court has held that "coercive police activity is a

19  necessary predicate to the finding that a confession is not 'voluntary' within the meaning of

20  the Due Process Clause of the Fourteenth Amendment." *Connelly*, 479 U.S. at 167.  In cases

21  of alleged psychological coercion, the court must carefully evaluate the totality of the

22  circumstances of the interrogation and their impact on the defendant's will. *Schneckloth v.*

23  *Bustamonte*, 412 U.S. 218, 226-27 (1973).  The pivotal question is whether a defendant's

24  will was "overborne" when he confessed. *Id.* at 225-26.  In evaluating the totality of the

25  circumstances of a defendant's confession, the Supreme Court has considered many factors,

26  including the extent of physical or psychological coercion, length of the interrogation, its

27  location, its continuity, and the defendant's maturity, education, physical condition, and

28  mental health. *Withrow v. Williams*, 507 U.S. 680, 693 (1993) (citing cases).

10

United States District Court

For the Northern District of California

1    After reviewing the transcript of the police interviews, this Court does not find the

2  state appellate court's decision to be unreasonable.  Although Petitioner displayed effects of

3  methamphetamine consumption and his behavior was erratic, nothing in the record suggests

4  that the interviewing officers' tactics caused Petitioner's will to be "overborne."

5  *Schneckloth*, 412 U.S. at 226.  In addition, Petitioner was experienced with the criminal

6  justice system, and the interviewing officers' questions cannot be described as threatening,

7  manipulative, or coercive.  As demonstrated by his ability to discuss the events at the Bauers'

8  home, albeit in a circuitous fashion, Petitioner was neither incapacitated nor incoherent as a

9  result of his drug use and sleep deprivation.  Moreover, the interrogation totaled

10  approximately two hours of questioning, which is not excessive in duration.  The officers

11  also offered Petitioner coffee and candy at the beginning of the second interview before

12  proceeding, which undermines a claim of unduly harsh treatment.  Perhaps most

13  significantly, Petitioner never indicated that he was unable to respond to the interviewing

14  officers' questions or that he wished to end the interview.

15    Based on all of the above, the state appellate court's conclusion that Petitioner's

16  statements to police were voluntary was not an unreasonable determination of the facts or an

17  unreasonable application of law.  Consequently, the Court DENIES Petitioner's claim that

18  his statements were inadmissible because they were not made voluntarily.

19

20    **C.    Claim 3: Sufficiency of the Evidence to Support a Burglary Conviction**

21    In his third claim, Petitioner challenges his conviction for burglary, which requires a

22  defendant to have unlawfully entered a dwelling with the intent to commit larceny or any

23  felony.  Cal. Penal Code § 459.  Petitioner was convicted of entering the Bauers' home with

24  the intent to violate California Penal Code section 220, which prohibits assault with the intent

25  to commit mayhem, rape, sodomy, oral copulation, rape in concert with another, lascivious

26  acts upon a child, or penetration of the genitals or anus with a foreign object.  Resp. Ex. F at

27  18.  He now argues that his due process rights under the Fifth and Fourteenth Amendments

28  were violated because the evidence presented at trial was insufficient to support a burglary

11

United States District Court
For the Northern District of California

1  conviction.  The state appellate court rejected this argument in its written decision.  *Id.* at

2  17-19.

3       The Due Process Clause "protects the accused against conviction except upon proof

4  beyond a reasonable doubt of every fact necessary to constitute the crime with which he is

5  charged."  *In re Winship*, 397 U.S. 358, 364 (1970).  A federal court collaterally reviewing a

6  state court conviction does not determine if the evidence at trial established guilt beyond a

7  reasonable doubt, but "whether, after viewing the evidence in the light most favorable to the

8  prosecution, *any* rational trier of fact could have found the essential elements of the crime

9  beyond a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in

10  original).  Thus, a petitioner's writ may be granted only if no rational trier of fact could have

11  found proof of guilt beyond a reasonable doubt.  *Id.* at 324.  The reviewing court must also

12  presume that the trier of fact resolved any conflicting inferences "in favor of the prosecution

13  and must defer to that resolution."  *Id.* at 326.  Pursuant to AEDPA, the court's inquiry is

14  limited to whether the state court's decision was "an unreasonable application of" *Jackson*

15  and *Winship* to the facts of the case.  *Juan H. v. Allen*, 408 F.3d 1262, 1275 (9th Cir. 2005).

16       After reviewing the evidence, viewed in the light most favorable to the prosecution,

17  this Court concludes that, notwithstanding Petitioner's arguments to the contrary,[1] a "rational

18  trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

19  *Jackson*, 443 U.S. at 319.  During his police interrogation, Petitioner made numerous

20  statements that could constitute evidence of his intent to commit a sexual assault.  While

21  Petitioner's responses were erratic when questioned by police as to his motive for entering

22  the Bauers' residence, he made a number of suggestive statements, including that "my

23  primary goal when I went in that house was to get pussy . . . ."  Resp. Ex. F at 19.  Petitioner

24  also told police that he was "trying to have a marathon sport fuck" and repeatedly explained

25

26       [1]Petitioner argues, for example, that he created substantial noise before entering the
   Bauers' house, which is inconsistent with the necessary surprise required to commit assault.
27  Similarly, Petitioner observes that, after he entered the Bauers' residence, he made no effort
   to harm anyone, he did not possess any weapons or tools, and no items from the house were
28  disturbed or missing.  Petitioner also contends that due to his mental state during the
   interrogation, his statements to police are unreliable and have minimal probative value.

United States District Court

For the Northern District of California

1    his presence at the Bauers' as being "a pussy thing." *Id.* Although many of Petitioner's

2    statements to police involved a CIA conspiracy or invoked the presence of God, that does not

3    render his other comments of a sexual nature unreliable or devoid of probative value. To the

4    contrary, Petitioner's suggestive sexual statements to police, coupled with his prior

5    misdemeanor conviction for annoying or molesting a child, are sufficient to allow a rational

6    trier of fact to conclude, beyond a reasonable doubt, that Petitioner intended to commit a

7    sexual assault when he entered the Bauers' residence.[2]

8        Therefore, the state appellate court reasonably applied clearly established Supreme

9    Court law in finding sufficient evidence to support Petitioner's burglary conviction.

10   Accordingly, the Court DENIES Petitioner's claim that the trial court violated his due

11   process right to be convicted by evidence proving his guilt beyond a reasonable doubt.

12

13       **D.    Claim 4: Admission of Evidence Relating to Prior Conviction**

14       Petitioner argues in his fourth claim that the trial court violated his due process rights

15   under the Fifth and Fourteenth Amendments by admitting evidence of his prior misdemeanor

16   sexual conviction and related statements to police. After the trial court denied Petitioner's

17   motion to suppress his statements to police on *Miranda* and voluntariness grounds, Petitioner

18   sought to exclude specific portions of the interview. Resp. Ex. F at 19-20. The trial court

19   and defense counsel engaged in a lengthy discussion regarding deleting portions of the

20   interrogation transcript, which totaled over 100 pages, before presenting this evidence to the

21   jury. *Id.* at 20. The court deleted numerous portions of the transcript, including discussions

22   of Petitioner's sex offender status, prior strikes, prison time, robbery conviction, and whether

23   he was considered a violent person. *Id.* The court, however, ruled that the entire discussion

24   of Petitioner's prior misdemeanor conviction under California Penal Code section 647.6 was

25   admissible. *Id.* at 20-21. Under California Evidence Code section 1108, the trial court is

26   permitted to consider "other sexual offenses as evidence of the defendant's disposition to

27       [2]Petitioner also challenges whether evidence relating to his prior conviction should
     have been admitted at trial. As discussed in section D below, this Court finds no merit to this
28   challenge.

1    commit such crimes, and for its bearing on the probability or improbability that the defendant

2    has been falsely or mistakenly accused of such an offense." *People v. Falsetta*, 21 Cal. 4th

3    903, 912 (1999) (citation omitted).

4        The state appellate court rejected Petitioner's argument that the trial court's

5    evidentiary rulings violated his due process rights. Resp. Ex. F at 24-28. The court held that

6    "the tapes and transcripts of the interrogation supported permissible inferences as to

7    appellant's intent at the time he entered the Bauer's [sic] home, and the admission of this

8    evidence did not render appellant's trial fundamentally unfair." *Id.* at 28.

9        A federal court's habeas review of a state conviction does not include an inquiry into

10    whether the trial court violated state evidence law. *See Estelle v. McGuire*, 502 U.S. 62, 67-

11    68 (1991) ("it is not the province of a federal habeas court to reexamine state-court

12    determinations on state-law questions"). Instead, the question for the federal court is

13    "whether the admission of the evidence so fatally infected the proceedings as to render them

14    fundamentally unfair." *Jammal v. Van de Kamp*, 926 F.2d 918, 919 (9th Cir. 1991). A trial

15    court's admission of evidence violates due process "[o]nly if there are no permissible

16    inferences the jury may draw from the evidence." *Id.* at 920.

17        In this case, the Court does not find that admitting evidence of Petitioner's prior

18    misdemeanor sex conviction rendered the trial fundamentally unfair. As discussed above,

19    Petitioner's statements to police were not rendered unreliable by his repeated references to a

20    CIA conspiracy and God's presence, and his statements were probative as to his motive for

21    entering the Bauers' residence. The jury could therefore draw a permissible inference from

22    the admitted evidence.

23        Petitioner also maintains that frequent redactions in the transcript and inaudible

24    portions of the tape compromised the reliability of his statements to police. The trial court,

25    however, instructed the jury to ignore any redactions in the transcript or inaudible portions of

26    the tape and, more specifically, not to infer any significance from these omissions. *Id.* at 27-

27    28. The trial court also properly redacted portions of the transcript to prevent the jury from

28    learning facts about Petitioner's criminal history that were potentially prejudicial or unrelated

United States District Court
For the Northern District of California

14

United States District Court

For the Northern District of California

1 to his specific intent in entering the Bauers' residence. These redactions and inaudible

2 portions of the tape, coupled with the court's instructions to the jury, would not cause the

3 transcript or tape to be overly confusing or prejudicial to a reasonable juror.

4       Petitioner next argues that evidence of his prior sexual conviction under California

5 Penal Code section 647.6 is inadmissible. The prior offense, however, is probative of

6 Petitioner's motive for entering the Bauers' house. The potential for prejudice or misuse was

7 limited because the prior sexual offense was a misdemeanor and evidence of the conviction

8 was countered by Petitioner's exculpatory version of the incident in the transcript of the

9 police interview. Resp. Ex. F at 25. Therefore, the trial court did not violate Petitioner's due

10 process rights by admitting evidence of his prior misdemeanor conviction.

11       Thus, admitting Petitioner's statements to police and his prior misdemeanor

12 conviction was not fundamentally unfair because the jury could permissibly infer from the

13 evidence that Petitioner intended to commit a sexual felony at the Bauers' residence.

14 Accordingly, the Court DENIES Petitioner's claim that the trial court's admission of the

15 contested evidence violated his due process rights.

16

17      **E.**    **Claim 5: Prosecutorial Misconduct**

18       In his fifth and final claim, Petitioner argues that the prosecutor engaged in

19 misconduct, thus violating Petitioner's due process rights under the Fifth and Fourteenth

20 Amendments. Petitioner asserts that the prosecutor's mischaracterization and misuse of

21 evidence rendered the trial fundamentally unfair – an argument the state appellate court

22 rejected on the merits. Resp. Ex. F at 33-41.

23       The facts and Petitioner's arguments are accurately summarized in the state appellate

24 court's opinion:

25         During the interrogation, Aviles said to appellant, "You tend to
        like young girls when you're on crank. Not when you're normal.

26         When you're on crank" to which appellant responded "Yeah."
        Appellant said he could not "even fathom a ten or twelve year

27         old girl being able to have sex" and Aviles asked him "How 'bout
        a 15 year old?" and commented "that's no problem if she's

28         willing. Appellant said "take away the psychological issues" and

15

**United States District Court**

For the Northern District of California

1    "the diseases" and Aviles added "just normal sex."  Appellant
     said "Well, yeah."

2

3    During closing argument, the prosecutor referred the jury to this
     part of the interrogation and argued, "Then he talks about having
     sex with a 15-year-old at the bottom of Page 55.  Where he hmms

4    and haws about it, middle of Page 56.  But ultimately he says oh,
     yeah, yeah.  Well, yeah.  Excuse me, I misspoke.  Well, yeah, sex

5    with a 15-year-old."  Appellant argues that in this passage the
     prosecutor mischaracterized appellant's statements, implying

6    "that appellant had engaged in sex with a fifteen-year-old and
     that he is not averse to sex with minors, even though the passage

7    does not support those interpretations."

8    In argument, the prosecutor said, "You can absolutely use the fact
     that this individual's a convicted sex offender, infer that he had

9    the disposition to do it again.  And he tells you when I'm under
     the influence of meth, I like girls; the younger the better."

10   Appellant argues that this mischaracterized the evidence because
     during the interrogation appellant said that when he was under

11   the influence of methamphetamine he likes girls "the younger, the
     better, provided they're old enough."

12

13   Appellant complains that the prosecutor argued "in the second
     interview, he comes close to telling the officer the real reason
     may not have been for Terry."  Appellant argues that because

14   "[t]he prosecutor did not identify any portion of the second
     interview that would warrant that characterization" the prosecutor

15   invited the jury "to speculate about what appellant might have
     come 'close to telling the officer.'"  Appellant complains that the

16   prosecutor misstated the evidence in arguing "Did he have a
     specific intent?  He tells you that on the tape: Why did you go

17   over there?  I went over there for sex.  I went over there for the P
     word.  I went over there because I hadn't been getting laid.  That's

18   why I took the dope in the first place."

19   Appellant fails to observe that the prosecutor said, "We also
     know a couple of things about this.  This begs the scrutiny of the

20   transcript, not just – the tape itself.  You get to decide what you
     find to be credible on that tape, . . . what statements you do not."

21
     . . . .
22

23   Appellant contends that the prosecutor misused evidence that was
     admitted for a limited purpose.  During cross-examination,
     defense counsel asked Detective Pierce whether, when he saw

24   that appellant was under the influence of methamphetamine and
     talking about the CIA and God, the detective could have had a

25   mental health professional observe the interview.  Defense
     counsel questioned Detective Pierce about a portion of the

26   interview during which Detective Moore told appellant, "You're
     just using crank because you're fucking crazy and it's fucking up

27   your head."  Defense counsel established that the detectives did
     not use the interview to explore possible psychological issues

28   appellant may have had and did not "feel there was a need" to

16

United States District Court

For the Northern District of California

1   talk to appellant again once he was no longer under the influence
2   of methamphetamine.  On re-direct examination, the prosecutor
    asked Detective Pierce why he did not "call a doctor or
3   psychiatrist" during the interview.  Detective Pierce testified over
    defense objection, "I didn't think there was any need for a
4   psychologist or doctor."  He said that he believed that during the
    interrogation appellant was "trying to manipulate the situation"
5   and "it was obvious to us he's been in the situation before, and he
    was just trying to control the situation, control the interview to go
6   the way he wanted it to go."  The trial court instructed the jury,
    "You should consider the officer's opinions of the defendant's
7   veracity, responsiveness and mental state only as it helps you to
    understand the officer's actions, if you find that helpful, and not
8   for any other reason.  Specifically, it's entirely up to you to gauge
    the truthfulness of the defendant's statements made during the
9   course of the interview."

10  In closing argument, defense counsel said, "One reasonable
    explanation for his behavior is that he was delusional."  He said
11  that in listening to the interrogation tapes the jury "will hear that
    [appellant's] thinking is disorganized and dysfunctional.  You
12  will hear that at times, he's answering a question that they ask
    him, two or three questions later."  In rebuttal, in response to
13  these arguments, the prosecutor pointed to the absence of any
    expert testimony that appellant was delusional and argued, "As I
14  said, every officer that had contact with him in the tapes, they
    keep saying, You have the scenario played out; sounds like you
15  thought this one through; you're going off on this tangent, and
    Officer Moore in particular is saying that's ridiculous. Come
16  back.  Moreover, none of that occurs in any kind of detail.  The
    whole thing about the CIA is ridiculous. . . . Detective Pierce:
17  Lucid, aware, knew what he was doing.  We were focusing him
    back because we didn't believe he was being forthright with us.
18  He was playing games."

19  Appellant argues, "The prosecutor exploited the objectionable
    quality of this evidence – the likelihood that the jury would treat
20  the officers' statements in the transcripts as expert evidence about
    appellant's mental state and credibility."  Respondent argues that
21  this claim of misconduct "fails because the court's limiting
    instruction applied to the in-court testimony of Detective Pierce;
22  it never purported to limit the prosecutor's argument based on
    statements made by officers during the interrogation, or the jury's
23  consideration of the text of the interrogation."

24  Resp. Ex. F at 36-37.

25       When evaluating whether a petitioner's due process rights have been violated by a

26  prosecutor's statements during argument, the court inquires if "the prosecutors' comments

27  'so infected the trial with unfairness as to make the resulting conviction a denial of due

28  process.'"  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v.*

**United States District Court**
For the Northern District of California

1  *DeChristoforo*, 416 U.S. 637, 643 (1974)).  The prosecutor is permitted to argue reasonable

2  inferences that follow from the evidence presented.  *United States v. Young*, 470 U.S. 1, 8 n.5

3  (1985).

4      After carefully reviewing the record, the Court finds no support for Petitioner's

5  argument that the prosecutor misstated and mischaracterized Petitioner's statements to

6  police.  The tape and transcript of Petitioner's statements to police, including the numerous

7  sexual references, could support the reasonable inference that Petitioner had the specific

8  intent to commit a sexual felony at the Bauers' residence.  During his argument, the

9  prosecutor urged the jury to scrutinize the transcript themselves to determine the credibility

10  of the tape.  The Court does not find that the prosecutor engaged in misconduct by drawing

11  the jury's attention to Petitioner's statements supporting the prosecution's theory of the case.

12      The Court also finds no support for Petitioner's argument that the jury treated

13  Detective Pierce's observations of Petitioner's behavior during the police interrogation as

14  expert evidence of Petitioner's mental state and credibility.  The prosecutor was entitled to

15  highlight the absence of expert testimony regarding Petitioner's mental health to combat

16  Petitioner's defense that he was delusional at the time of the crime.  The Court agrees with

17  the state appellate court's conclusion that no reasonable probability suggests that the jury

18  misused the prosecutor's argument, especially when considered with the trial court's limiting

19  instruction.

20      Consequently, the Court concludes that the appellate court's decision to deny

21  Petitioner's claim of prosecutorial misconduct was not contrary to, or an unreasonable

22  application of, clearly established Supreme Court law.  The Court therefore DENIES

23  Petitioner's prosecutorial misconduct claim.

24  //

25  //

26  //

27  //

28  //

18

**United States District Court**
For the Northern District of California

1 | **V.    CONCLUSION**

2          For all of the reasons discussed above, Petitioner has failed to show that he is entitled

3 to habeas relief in this case.  Accordingly, with good cause appearing, Petitioner's petition

4 for a writ of habeas corpus is DENIED.  The Clerk shall enter judgment and close the file.

5

6 | **IT IS SO ORDERED.**

7

8 | Dated:   03/05/08

THELTON E. HENDERSON, JUDGE
UNITED STATES DISTRICT COURT

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28